[No. C000159. Third Dist. Mar. 2, 1988.]

BANK OF STOCKTON, Plaintiff and Respondent, v.
DIAMOND WALNUT GROWERS, INC., Defendant and Appellant.

COUNSEL

Barry F. Kriebel, Neumiller & Beardslee, James A. Askew, Richard M. Archbold and Douglas P. Winter for Defendant and Appellant.

Tuttle & Taylor, Robert G. Taylor, Harold J. Kwalwasser and Kathy T. Wales as Amici Curiae on behalf of Defendant and Appellant.

Kroloff, Belcher, Smart, Perry & Christopherson and Gary Christopherson for Plaintiff and Respondent.

148

148 Severson, Werson, Berke & Melchior and Jan T. Chilton as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**BLEASE, Acting P. J.**—This is an appeal from a judgment declaring the priority between two creditors holding security interests, governed by the California Uniform Commercial Code,[1] arising from loans involving a walnut crop. Diamond Walnut Growers, Inc. (Diamond), an agricultural marketing association, made loans to one of its members, Bella-Farms Partnership (Bella-Farms), secured by Bella-Farms's share of the funds, called "member proceeds," to be received from the sale by Diamond of its 1983 walnut crop. The Bank of Stockton (Bank) also made a loan to Bella-Farms secured by the 1983 crop and by all "proceeds" from its sale. Prior to the harvest of the crop, Diamond and the Bank learned of the other's interest and agreed that the 1983 crop could be delivered to Diamond for marketing with the caveat that "[t]he parties do not intend by this agreement to change their respective rights and duties . . . ." The crop was delivered to Diamond and sold by it, thus creating "member proceeds." This litigation ensued to ascertain the parties' competing claims to such funds in light of their agreement. The trial court ruled in favor of the Bank.

We will reverse the judgment on the grounds that, although the Bank perfected (§ 9203) a security interest in the Bella-Farms "member proceeds" as Commercial Code "proceeds" (§ 9306), and Diamond perfected a security interest in them, as a Commercial Code "account" (§ 9401), Diamond's interest has priority over the Bank's interest because its financing statement was filed prior to that of the Bank (§ 9312, subd. (5)(a)), and that this priority was unaffected by the agreement between Diamond and the Bank.

### FACTS

The case was tried upon an agreed statement of facts. Diamond is an incorporated nonprofit agricultural marketing cooperative association, organized under Food and Agricultural Code section 54001 et seq. for the purpose inter alia of marketing the walnut crops of its members. Bella-Farms, which operated a walnut and chestnut ranch located in Linden, San

---

[1] All unspecified references to sections are to the California Uniform Commercial Code, also referred to as the Commercial Code or simply Code.

Joaquin County, became a member of the association in March 1982. The membership agreement obligates Bella-Farms "to sell and deliver to Diamond all walnuts which [it] produces . . . for a five-year period" and, Diamond, by virtue of its by-laws, is obligated to market the walnuts and to pay to Bella-Farms its "member proceeds," defined as the member's pro rata share of the funds obtained from the net proceeds of sale of all walnuts delivered to Diamond for marketing. The agreement provides that the delivery is "for consignment marketing" and describes Diamond as the "marketing agent for the member."

During October and November 1982 Diamond made several loans (advances) to Bella-Farms pursuant to written agreements providing that Bella-Farms assigned to Diamond its interest in its "member proceeds . . . now or hereafter payable" and would repay the unpaid balance on September 15, 1983. In the same year, 1982, Diamond filed a financing statement pertaining to these loan agreements with the Secretary of State.

In December of the previous year, 1981, Bella-Farms entered an agreement to borrow money from the Bank to be repaid on January 31, 1983, and drew various sums from the Bank, pursuant to the agreement, between its inception and September 1982. Bella-Farms did not repay the Bank on January 31, 1983, as agreed. The Bank filed an action to recover the amount owing. In June 1983 the Bank and Bella-Farms contracted to postpone collection of the debt. In return Bella-Farms undertook to give the Bank "a valid, insurable lien on certain equipment on the property described in the complaint ('the property'), and a valid, insurable *first* lien on all crops grown on the property and a first assignment of all proceeds from the sale of all crops grown on the property (whether such crops are now growing on the property or already have been sold), and [to file] an answer to our complaint within thirty days." (Italics in original.)

The contract provided that collection of the debt was postponed "until November 1, 1983, or until the crop is sold, whichever first occurs . . . ." The contract also provided that the "debt will become immediately due and we may proceed immediately with all remedies available to us for collection of all money owed, upon the occurrence of any of the following events: [¶] 1. A determination by us in our sole discretion at any time that the crop or equipment lien you agree to give us is insufficient for any reason to assure full and timely payment to us . . . ."

On June 21, 1983, in the year following Diamond's filing of its financing statement, the Bank filed with the San Joaquin County Recorder a financing

statement pertaining to its contract with Bella-Farms. Two days later it made a similar filing with the Secretary of State.

Neither the Bank nor Diamond had actual notice of the other's claim at the time their financing statements were filed. However, in July 1983 they exchanged copies of the statements. On September 27 of that year the Bank and Diamond entered into a written agreement. It provided that Bella-Farms could deliver its 1983 crop to Diamond for sale. However, it specified that: "In entering into this agreement, each party reserves all of its rights and claims with respect to the 1983 crop and its proceeds. The transfer of physical possession of the crop to Diamond shall not change the rights of the parties." The full text of the agreement is set forth in the section of this opinion which discusses its import.

The Bank and Bella-Farms also executed a written agreement on September 27, 1983. This agreement granted Bella-Farms a six-month continuance of the trial date in the Bank's collection action. In return Bella-Farms agreed that it "does assign to Bank, to the extent permitted by law, all of its right, title and interest in the 1983 walnut crop . . . ." The agreement also provides that "Bella-Farms shall deliver its 1983 walnut crop to Diamond" and that "[t]he parties do not intend by this agreement to change their respective rights and duties . . . ."

Beginning in early October and continuing through November 1983, the Bella-Farms's walnut crop was delivered to Diamond and was sold by it. Bella-Farms's share of funds derived from the sale from the 1983 walnut crop (its "member proceeds") was approximately $220,000. Bella-Farms's debt to the Bank is in excess of $500,000 (as of Oct. 1984). Bella-Farms's debt to Diamond is about $135,000 (as of Sept. 1983). At the conclusion of the 1983 crop season Bella-Farms ceased farming operations and has no known assets other than the monies in dispute in this action and approximately $41,318.55 in member proceeds attributable to the 1982 crop year.

The judgment declares that the Bank's security interest in the 1983 walnut crop and proceeds is prior to and superior to any claim of Diamond and orders Diamond to pay to the Bank all proceeds from the sale of the crop. This appeal followed.

## DISCUSSION

### I

The classification and priority of security interests are governed by division 9 of the Commercial Code, which derives from the Uniform

Commercial Code (UCC). In general, a "Security Agreement" is "an agreement which creates or provides for a security interest" (§ 9105, subd. (l)), defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." (§ 1201, subd. (37).) Security interests are variously classified and defined; two varieties—"account" (§ 9401) and "proceeds" (§ 9306)—bear on the resolution of this case. The priority of a security interest depends, among other things, upon its being "perfected," which occurs "when it has attached and when all of the applicable steps required for perfection have been taken" as required by sections 9302, 9304, 9305 and 9306. (§ 9303.) As pertinent here, an interest is perfected when (a) the debtor has rights in collateral (§ 9203, subd. (1)(c)); (b) the security interest has "attached," i.e., has become "enforceable against the debtor" (§ 9203. subd. (2)); and (c) a "financing statement" has been filed (§ 9302, subd. (l))(d) in the appropriate place of filing (§§ 9401, subd. (1)(b) and 9306, subd. (3)). If competing security interests are thus "perfected," their priority is normally governed by the date of filing of the UCC financing statement. (§ 9312, subd. (5)(a).)

The sums which are the subject of the disputed security interests, referred to as "member proceeds" in the Bella-Farms—Diamond marketing agreement,[2] stem from Bella-Farms's contractual right to a share of the funds attributable to Diamond's sale of its 1983 walnut crop.

A

*Diamond's Security Interest*

Diamond's security interest in these sums derives from the marketing agreement which provides that repayment of the balance due on its loans to Bella-Farms is secured by its "member proceeds," "now or hereafter payable," which includes Bella-Farms's right to a pro rata share of the net funds obtained from Diamond's sale of its members' 1983 walnut crops. Diamond's security interest in these "member proceeds" is predicated upon their status as an "account," as that term is defined in section 9106.[3]

---

[2] We note that the *contractual* term "member proceeds" is not equivalent to the Commercial Code definition of "proceeds" as a security interest (see § 9306), notwithstanding the similar nomenclature. As it turns out, the parties both have security interests *in* the "member proceeds," but under different provisions of the code; Diamond as an "account" and the Bank as "proceeds."

[3] We will discuss the Commercial Code meaning of "proceeds" (§ 9306) later in the opinion, in connection with the Bank's claim of a security interest. At this point it suffices to note that *Diamond* had not perfected a security interest in the "member proceeds," as Commercial Code "proceeds" of the sale of the *walnut crop,* because it failed to file a UCC financing statement with the appropriate agency. "[A] security interest in proceeds can be perfected

■ Section 9106 defines an " '[a]ccount' [as] any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper . . . ." A security agreement may establish a security interest in afteracquired property by virtue of a contractual right to an account that is to be created (§ 9204), here Bella-Farms's contractual right to its "member proceeds," a legal right to a share of funds from the future sale by Diamond of its 1983 walnut crop. This security interest "attached" when Diamond gave value, Bella-Farms signed the security agreement, and Bella-Farms had rights in the account. (§ 9203, subds. (1) and (2); § 9105, subd. (1)(c).) Bella-Farms had rights in the account, under the membership agreement, at the time of execution of the security agreement, i.e., prior to the time the "member proceeds" had been earned by performance. (See § 9106, and the Cal. U. Com. Code com. thereto.) This occurred prior to the delivery of the walnut crop by Bella-Farms to Diamond. The attachment completed the steps required for the perfection of this security interest. (§ 9303.)

The trial court erroneously concluded that Diamond's security interest could not attach to the "member proceeds" until they had been earned, i.e., until Diamond performed its end of the agreement by the receipt of funds from the sale of the 1983 crop, thus completing the acts necessary to render the account payable. This conclusion is incorrect because it is predicated upon an interpretation of the Commercial Code as it existed prior to 1974. In that year amendments to the code were adopted which explicitly provide that a security interest can attach to a right to an account receivable whose creation is contingent upon future performance.

Before 1974, various sections of the Commercial Code suggested that an account came into existence *only upon performance*. Former section 9204, subdivision (2)(d) provided that the debtor had no rights "[i]n an account until it comes into existence." The 1974 amendment deleted this provision. It added subdivision (1) to provide, in pertinent part, that "a security agreement may provide that any or all obligations covered by the security agreement are to be secured by afteracquired collateral." (Stats. 1974, ch. 997, § 17, p. 2123, eff. Jan. 1, 1976.) The UCC comment to this section says that the statute "makes clear that a security interest arising by virtue of an after-acquired property clause has equal status with a security interest in

only by the methods . . . permitted . . . for *original* collateral of the same type" (§ 9306, subd. (3)(c); italics added), here, the walnut crop, which requires the filing of a UCC financing statement in the county in which the crops are grown. A financing statement pertaining to an interest in "crops growing or to be grown" must be filed in the "office [in the county] where a mortgage on the real estate would be recorded" (§ 9401, subd. (1)(b)), which Diamond did not do.

collateral in which the debtor has rights at the time value is given under the security agreement."

Similarly, *former* section 9106 defined an "account," as a "contract right," and "general intangibles." The UCC comment to this former provision stated that an "[a]ccount' as defined is a right to payment for goods sold or leased or services rendered: that is to say, a right *earned by performance,* whether or not due and payable . . . ." (Italics added; see *Richmond Crane Rigging & Drayage Co.* v. *Liberty Nat. Bank* (1972) 27 Cal.App.3d 968, 974 [104 Cal.Rptr. 277].) The 1974 amendment to section 9106 did away with "contract right" altogether. The amendment, as italicized, provides: " 'Account' means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, *whether or not it has been earned by performance.*" (Stats. 1974, ch. 997, § 11, p. 2121, eff. Jan. 1, 1976.) The UCC comment to the amended statute says, "This Article rejects any lingering common law notion that only rights already earned can be assigned."

The right thus sanctioned is a sufficient "right in the collateral" to allow attachment at the time "it becomes enforceable against the debtor . . . ." (§ 9203, subd. (2).) Cases relied upon by the trial court and by the Bank either contain no discussion of the applicable statutory language (e.g. *Cissell* v. *First Nat. Bank of Cincinnati* (S.D.Ohio 1979) 476 F.Supp. 474, 492-493) or were decided under pre-1974 versions of the UCC as enacted in other states. (See *Weld Colorado Bank* v. *E. & E Const., Inc.* (Colo.App. 1982) 653 P.2d 758, 760; *In re De-Flectronics, Inc.* (D.Conn. 1967) 4 U.Com.Code Rep. 450, 454.)

█ The 1974 amendments permit lenders to obtain security in the debtor's contingent accounts receivable by entering into valid security agreements and by making appropriate Commercial Code filings which put other lenders on notice. A subsequent lender with actual or constructive notice of a security interest in an account thus created should not be allowed to undercut the priority of a prior lender by asserting that the account is not collateral until the right to payment has matured. This would foster imprudent lending and knowing inducements to breach of contracts. In the usual case the subsequent lender would receive actual notice of the priority of the interest in the unmatured account by a routine Commercial Code filing check.

## B

### *The Bank's Security Interest*

■ The Bank also had a valid security interest, as of the time of trial, in the "member proceeds." Under the Bank's security agreement with Bella-Farms, the performance of its financial obligations is secured by an interest in the 1983 walnut crop and the "proceeds" of its sale. Using this latter term in its Commercial Code sense, "'[p]roceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. . . . Money, checks, deposit accounts, and the like are 'cash proceeds.' All other proceeds are 'noncash proceeds.'" (§ 9306, subd. (1).) ■ However, the nature of the Bank's security interest in the "original collateral," the crops, governs the nature of its perfection of the security interest in the "proceeds" therefrom. (§ 9306, subd. (3)(c); see fn. 3, *ante.*) Subject to exceptions not pertinent here, "[t]he security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected . . . ." (§ 9306, subd. (3).) That affects the place of filing, the county in which the crops are grown, which may explain the failure of the Bank to search the UCC filings with the Secretary of State, where it should have located Diamond's prior UCC financing statement. "When the collateral is crops growing or to be grown [the place of filing is] the office where a mortgage on the real estate would be recorded," here the filing with the county recorder in June 1983. (§ 9401, subd. (1)(b); see also §§ 9303, subd. (1) and 9302.) The Bank's interest in the "proceeds" of the growing crops "is a continuously perfected security interest if the interest in the original collateral was perfected . . . ." (§ 9306, subd. (3).)

## II

### *The Priority of the Security Interests*

■ Both of the parties thus had security interests in the Bella-Farms "member proceeds." The priority of these interests is normally governed by the first date of filing of the UCC financial statements. In that case Diamond's 1982 filing of its UCC financing statement with the Secretary of State prior to the Bank's 1983 filing of its financing statement with the county, gives its security interest priority over the Bank's security interest.

Priority is the central issue addressed by Division 9 of the Commercial Code. (See Secured Transactions in Cal. Commercial Law Practice (Cont.Ed.Bar 1986) ch. 4, § 8.10, hereafter *Secured Transactions.*) The usual rule of priority is: "Conflicting security interests rank according to

priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, *whichever is earlier*, provided that there is no period thereafter when there is neither filing nor perfection." (§ 9312, subd. (5)(a), italics added.) In other words, providing that the competing interests are both perfected, without regard to the date of perfection, the time of filing of the UCC financing statement governs the priority of the interests.

Two issues complicate this determination of the priority of the interests.

## A

### *The Problem of the Crop and the Proceeds*

The first complication arises because the Bank obtained a security interest in both the crop *and* proceeds and Diamond obtained a security interest only in the "member proceeds." However, this complication is easily resolved. As to the crop, the Bank is a secured creditor and Diamond is an unsecured creditor. (See fn. 3, *ante*.) Hence, as to the *crop*, the Bank's security agreement is effective "according to its terms" against Diamond. (§ 9201.) But, as to the rights to receive "member proceeds," all other things being equal, both parties are perfected secured creditors and Diamond, which filed its UCC financing statement prior to the Bank's filing, would be accorded priority under the usual rule. (See Cal. U. Com. Code, com. to § 9312, com., subds. 4 and 5, example 8.)[4] Priority is assigned as to

---

[4] The comment to subdivision 4 says in pertinent part as follows: "There is a single priority rule based on precedence in the time as of which the competing parties either filed their security interests or perfected their security interests. The form of the claim to priority, i.e., filing or perfection, may shift from time to time, and the rank will be based on the first filing or perfection so long as there is no intervening period without filing or perfection. Filing may occur as to particular collateral before the collateral comes into existence. Under the standards of Section 9-203 perfection cannot occur as to particular collateral until the collateral itself (and not prior collateral) comes into existence and the debtor has rights therein; but under subsection (6) of this section the secured party's priority may date from his time of perfection as to the prior collateral, if perfection or filing has been continuously maintained. Subsection (6) provides that a date of filing or perfection as to original collateral is also a date of filing or perfection as to proceeds. This rule should also be read with Section 9-306, which makes it unnecessary to claim proceeds expressly in a financing statement and provides in effect that a filing as to original collateral is also a filing as to proceeds (with exceptions therein stated). Thus, if a financing statement is filed covering inventory, then (subject to the exception involving multistate problems) this filing is also a filing as to the resulting accounts and constitutes the date of filing as to the accounts. [¶] The party who may have had a prior security interest in inventory or may have had the only such security interest does not automatically for that reason have priority as to the accounts. His claim to accounts may or may not have priority over competing filed claims to accounts. The priority is based on precedence as to the accounts under the rules stated in the preceding paragraph."

the particular collateral in issue. The party which has the highest priority or only security interest as to goods does not for that reason have priority as to the collateral, e.g., account or proceeds, derived from the sale of the goods.

Accordingly, the original rights of the Bank and Diamond under the Commercial Code are as follows. So long as the security interest in the crop exists, if Bella-Farms defaults under its security agreement with the Bank, the Bank has the right to employ the remedies provided in the Commercial Code, e.g., to take possession of the crop and thereafter to liquidate it. (See e.g., *Secured Transactions, supra,* ch. 5.) This action would prevent the advent of or extinguish the existence of proceeds, specifically the member proceeds account owing to Bella-Farms by Diamond. Upon the advent of proceeds of the crop, the Bank's security interest in the proceeds was perfected (by relation back to the original collateral) and upon default the Bank would have the right to possession of the proceeds, enforceable against anyone save a secured creditor with a higher priority. If the crop were lawfully marketed other than by delivery to Diamond, the Bank would be the sole secured creditor as to funds which were the proceeds of that transaction. However, as it turned out, the crop was delivered to Diamond. When the crop was sold by Diamond, there were created "member proceeds," the member's share of funds from the sale, pursuant to their agreement. The creation of "member proceeds" resulted in a fund from which Diamond's security interest could be satisfied. As we have shown, Diamond's interest in that account was perfected and Diamond had the right to the account against anyone save a secured creditor with higher priority. In this latter case, absent an agreement altering priority, Diamond would have a superior right to that of the Bank by virtue of its earlier filing of its UCC financing statement. That leads us to consider the agreement between Diamond and the Bank.

## B

*The Effect of the Agreement Between the Bank and Diamond*

The rules provided by the Commercial Code may be varied by contract except as it otherwise provides. (§ 1102.) Nothing in Division 9 prevents subordination of priority by agreement. (§ 9316.) The Bank argues that the intention and effect of the agreement between it and Diamond was to change the priority of security interests as otherwise governed by the Commercial Code. It argues that the agreement fixes the time for resolution of the dispute at September 27, 1983, i.e., that the agreement amounts to a direction that the party that would have prevailed on that date should prevail thereafter.

We glean Diamond's legal theory with respect to the agreement from its trial briefing, since it unaccountably failed to address the matter in its brief on appeal. Diamond asserts that the only purpose of the agreement is to assure that neither party waived its existing rights and it was not intended to change any rights. Diamond has the more tenable reading of the agreement.

The agreement provides as follows: "THIS AGREEMENT is made as of the 27th day of September, 1983, by and between DIAMOND WALNUT GROWERS, INC., a California non-profit agricultural cooperative association ('Diamond') and BANK OF STOCKTON, a corporation ('Bank'). [¶] RECITALS: [¶] A. [Bella-Farms owns the ranch in Linden.] [¶] B. Diamond and Bank each assert a security interest in, and each asserts rights prior to the other, in the 1983 walnut crop ('1983 crop') to be harvested on the Bella-Farms Ranch. Each party disputes the claims of the other. [¶] C. Diamond asserts that Bella owes it about $130,000. Bank asserts that Bella owes it in excess of $475,000, plus costs, fees and additional interest from March 1, 1983. [¶] D. Subject to the terms and conditions set forth below, the parties wish to encourage the delivery of the 1983 crop to Diamond, while preserving their respective rights and claims with respect to the crop and its proceeds. [¶] NOW, THEREFORE, Diamond and Bank agree as follows: [¶] 1. If the 1983 crop from the Bella-Farms Ranch is delivered to Diamond, the progress payments normally payable to a grower on delivery of a crop will be paid directly to Bank. It is contemplated, but not guaranteed, that this progress payment will be about 20¢ per pound for the 1983 crop. The balance of the proceeds will be held by Diamond until Diamond and Bank either agree on their respective interests in the crop, or until the interests of each are resolved by appropriate legal action. [¶] 2. *In entering into this agreement, each party reserves all of its rights and claims with respect to the 1983 crop and its proceeds. The transfer of physical possession of the crop to Diamond shall not change the rights of the parties.* [¶] 3. Except by agreement of the parties, or by order of a court, Diamond will make no payments to any party other than Bank of any proceeds payable from the sale of the 1983 crop. [¶] 4. If the 1983 crop is not delivered to Diamond, or if it is necessary because of the conduct of Bella for Diamond to institute legal action to compel delivery of the 1983 crop to it, this agreement shall be of no further force or effect. [¶] 5. This document contains the entire agreement of the parties. It may be changed only by another instrument in writing signed by the parties." (Italics added.)

█  On appeal where, as here, there is no conflict in the extrinsic evidence concerning the meaning of the terms of a written contract, the interpretation of the contract is the obligation of this court. (*Parsons* v. *Bristol*

*Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839]; see 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 292-295, pp. 303-306.) In this enterprise we are guided by the pertinent rules of the Civil Code for removing uncertainty. (See Civ. Code, §§ 1635-1656.) We must give effect to the mutual intention of the parties ascertained from the writing. (Civ. Code, §§ 1636, 1639.) We read the contract as a whole, giving effect, if reasonably practicable, to every part. (Civ. Code, § 1641.) The context may shed light on the language of the contract, and the applicable laws are part of this backdrop. (Civ. Code, §§ 1647, 1656; see 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 530, p. 452.) ██ Apparent repugnancy must be reconciled, if possible, by an interpretation that gives some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract. (Civ. Code, § 1652; 1 Witkin, Summary of Cal. Law, *supra,* § 533, pp. 454-455.)

██ The agreement is cryptic with respect to its effect on the security interests of the parties. On the one hand it says that each party is reserving *all* rights and claims with respect to the 1983 crop and its proceeds. On the other hand it asserts that transfer of physical possession of the crop to Diamond shall not change the rights of the parties. The Bank argues that the agreement fixes the temporal point of resolution of rights at September 27, 1983, and that subsequent events must be disregarded. This argument, however, makes no sense since there can be no rights or claims to the "member proceeds" fund unless subsequent events are considered, the crop having been sold and transmuted into "member proceeds." The Bank appears to view its right and claim to the crop and its subsequent proceeds as a unitary matter to be governed by its interest in the *crop* notwithstanding the extinction of the crop. Under this theory, Diamond has no perfected security interest whatever, since whatever interest it might have had in the crop was not perfected by the filing of a financial statement in the appropriate county office. (See fn. 3, *ante.*) However, the theory is incorrect; the crop and proceeds are separate items of collateral. Under some circumstances one may simultaneously have a security interest in both the original collateral and its proceeds. (See § 9306.)

Diamond's implicit argument is that the agreement is not meant to fix the claims but only to avoid any imputation of waiver of existing rights because of acquiescence in the transfer of possession. Allowing a transfer of possession of a crop under some circumstances can be considered a waiver of a creditor's security interest. (See § 9306; also cf. *Imperial NH3* v. *Central Valley Feed Yards, Inc.* (1977) 70 Cal.App.3d 513 [139 Cal.Rptr. 8].) Diamond's argument plausibly reconciles the dual assertions in the agreement that (a) it is intended to reserve all of the rights of the parties and (b) that

the rights are not to change as a result of change of possession of the walnut crop.

The Bank argues that this cannot be the meaning of the agreement because if so construed the Bank suffers a loss of the advantage it had in being able to cut off Diamond's security interest by levying upon the crop. The Bank asserts that it is absurd for it to agree to such a disadvantage. This argument presumes that the parties had a legally correct view of their security interests in the crop and its proceeds. From all that appears no such convergence of perception formed the basis of the agreement. If the Bank thought the agreement was to have the effect of changing the rights and claims of the parties, i.e., of altering the Commercial Code rules for priority by importing priority in the crop as the rule for priority in the proceeds, it was incumbent upon it to so specify. Absent specification to the contrary, the rules provided by the Commercial Code are unaltered. The onus of showing that the agreement alters such rules is on the party which advocates that outcome. There is no such statement in the agreement. Rather, the tenor of the agreement is *preservation* of existing rights and claims. Accordingly, we read the agreement as meant to let the chips fall as they might with the proviso that no waiver of existing security interests could be implied from the transfer of physical possession of the crop to Diamond.

Thus read, the Bank's security interest in the walnuts continued despite transfer of their possession to Diamond. However, when the walnuts were sold by Diamond that security interest was extinguished. (§ 9307.) Prior to that point the Bank could have foreclosed on the walnut crop. After the sale all that was left was the proceeds of the sale as to which Diamond had also perfected a security interest.[5]

---

[5] The so-called assignment of the crop by Bella-Farms to the Bank prior to the delivery of the crop to Diamond would not have altered this hypothetical outcome. There is no evidence that Bella-Farms or the Bank gave notice of the purported assignment to Diamond prior to delivery or that the Bank instructed Bella-Farms to condition delivery upon Diamond's acceptance of the walnuts for marketing as property owned by the Bank. (See § 9318; cf. Code Civ. Proc., § 368; *Secured Transactions, supra,* § 8.10; *Garner* v. *Uddo & Taormina Co.* (1955) 137 Cal.App.2d 819 [290 P.2d 967]; see generally *Crosby* v. *Fresno Fruit Growers' Co.* (1916) 30 Cal.App. 308, 309-312 [158 P. 1070].)

The purported assignment does not appear to amount to an outright transfer of ownership of the 1983 walnut crop. The use of the term title to describe the nature of the assignment is not dispositive. (See § 9202.) More pertinent is the term of the assignment requiring that Bella-Farms deliver "its" walnuts to Diamond (as required under membership contract) and providing that it "consented" to payment of the proceeds to the Bank. The documents show that the Bank desired to take advantage of the existing contractual relationship for marketing between Bella-Farms and Diamond. Indeed, it is open to question whether Diamond would be able to accept delivery of walnuts owned by a nonmember under its by-laws and the statutes governing cooperatives. (See generally Food & Agr. Code, § 54001 *ff.*) Having accepted

It is unfortunate that one of these creditors must lose out to the other. Other unsecured creditors may also have suffered in the demise of the Bella-Farms's operation. At the outset the Bank had no security. Diamond was the only secured creditor and gave notice to all of its interest in the account of "member proceeds" that would arise after the delivery and sale of the crop as required under its membership contract with Bella-Farms. Either through calculation or ignorance Diamond left itself at partial risk concerning the crop itself or its proceeds if the crop were lawfully marketed elsewhere. The Bank then filled this niche, leaving itself exposed to loss of its advantage if default did not occur soon enough or if it failed to take possession of the crop prior to extinction of its security interest in it. Neither the Bank nor Diamond has any compelling equitable claim vis-à-vis the other. They paid their money and took their chances.

The judgment is reversed.

Sims, J., and Deegan, J.,* concurred.

Respondent's petition for review by the Supreme Court was denied May 18, 1988.

---

the benefits of the Bella-Farms's contract, the Bank must accept the burden of characterization of the status of the participants embedded in the contract.

*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.