[No. C050715. Third Dist. Apr. 19, 2007.]

CONDON-JOHNSON & ASSOCIATES, INC., Plaintiff and Respondent, v. SACRAMENTO MUNICIPAL UTILITY DISTRICT, Defendant and Appellant.

## COUNSEL

Downey Brand, Arthur G. Woodward, Rhonda Cate Canby, Kenneth Gino Zanotto and Michael J. Kuzmich for Defendant and Appellant.

Watt, Tieder, Hoffar & Fitzgerald, Michael G. Long and Christopher M. Rogers for Plaintiff and Respondent.

## OPINION

**BLEASE, Acting P. J.**—Public Contract Code section 7104[1] requires that a local public entity that has contracted for public work involving an excavation deeper than four feet issue a change order altering the contractor's cost of performing the work when the subsurface conditions at the jobsite materially differ from those "indicated" in the contract. (§ 7104, subds. (a)(2) & (b).)

Plaintiff Condon-Johnson & Associates, Inc. (Condon-Johnson), was the low bidder on a contract with defendant Sacramento Municipal Utility District (SMUD) to construct 13 concrete foundations for piers to relieve the pressure caused by the moving hillside behind a powerhouse owned by the utility. The contract required Condon-Johnson to bore holes through the hillside to the site of the pier foundations. The contract contains a changed conditions clause incorporating the requirements of section 7104.

The contract sets forth soil boring information for the "p[ur]pose of determining what type of rock may be encountered . . . ." The information includes the boring logs from two test borings by SMUD adjacent to the jobsite and the results of compression testing of two rock samples selected by SMUD from one of the borings. The contract represents the samples as "the most competent core samples" recovered from the borings and asserts the results of the compression tests are provided "to give additional information as to what may be expected in the pier drilling."

The contract also contained *general* disclaimers that, inter alia, provided "[i]t is the sole responsibility of the Contractor to evaluate the jobsite and make his own technical assessment of subsurface soil conditions for determining the proposed drilling process, equipment and make his own financial impact assessment prior to bidding."

---

[1] All further statutory references are to the Public Contract Code unless otherwise indicted.

When Condon-Johnson encountered a type of rock during drilling materially different (harder) than the test samples, which increased the cost of drilling, it sought a change order, SMUD refused and Condon-Johnson brought this action. Before trial, the court granted in limine motions excluding the disclaimers from jury consideration, reasoning they were in conflict with section 7104. The jury awarded Condon-Johnson the sum of $1,265,166 on the basis of the remaining contract provisions.

The sole issue on appeal is whether the trial court properly excluded the disclaimers from jury consideration. Resolution of the issue turns on the meaning of the term "indicated" in section 7104 and incorporated in the changed conditions clause of the contract.

We will conclude that "indicated" refers to contract information provided prospective bidders from which an inference reasonably might be drawn as to the actual subsurface conditions at the work site. In this case the contract set forth the soil boring information for a purpose that invited Condon-Johnson to infer that the type of rock in the test samples would be the type of rock that may be "expected" or "encountered" in performing the work. Since the disclaimers wholly denied responsibility for the subsurface conditions indicated, in violation of section 7104, they were properly excluded from jury consideration.

We will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In the 1960's, SMUD constructed the Camino powerhouse on the South Fork of the American River as a source of hydroelectric power. After its completion, SMUD noticed the hillside on which the powerhouse was built was moving and exerting pressure on the back wall of the powerhouse. SMUD designed a system to relieve the pressure caused by the moving hillside, which included the construction of 13 concrete pier foundations behind the powerhouse.

Originally, SMUD solicited contractors to bid on the project through a process known as an "invitation to bid." SMUD received only one bid, which was deemed nonresponsive. The lack of bids was due to SMUD's requirement that the winning contractor use an oscillator/rotator drill for the project, which few contractors had.

In April 2002, SMUD again solicited bids for the project, this time through a "request for proposal." The requirement of an oscillator was removed, and bidding contractors were required to propose the means and method for completing the project.

The initial version of the contract contained a clause that provided: "The District has performed soil boring along the penstock, adjacent to the jobsite. The subsurface description and boring logs are provided in Appendix D.[2] The core samples taken from these boring . . . are actually closer to the powerhouse than the proposed pier locations. Based on the historical photo, included in the Technical Conditions, the District expects much less backfill at pier locations as compared to the sample locations. It is the inten[t]ion of the District to provide the soil boring information for the p[ur]pose of determining what type rock may be encountered and not for determining the profile of backfill to rock."

During a meeting with potential bidding contractors, a contractor asked to take pieces of rock from one of SMUD's core boxes and have compression tests run on them. Rather than have the contractor take the samples, SMUD allowed the contractor to select samples from its core boxes on which SMUD would run the tests, and the results would be published in an addendum to the request for proposal to be distributed to all potential bidding contractors. Later that month, SMUD published addendum No. 1 and incorporated it into the contract. The addendum provided: "The District has completed compression testing on two samples from the M-2 boring, at 20.0 and 25.7 feet. These tests were completed to give additional information as to what may be expected in the pier drilling. These samples were selected, by the District, on the basis of visually appearing to be the most competent core samples in the M-1 and M-2 recovery."

Ultimately, SMUD received bids from four or five contractors, and in July 2002 awarded the contract to Condon-Johnson.

The contract required Condon-Johnson to install 13 reinforced concrete pier foundations behind the powerhouse two meters in diameter and between 62 and 82 feet in depth. As is relevant here, the contract included the following clauses: (1) "GC-35 Changed Conditions At The Jobsite," which entitled Condon-Johnson to equitable adjustments if "[s]ubsurface . . . conditions at the jobsite differ[ed] materially from those indicated in th[e] Contract" (changed conditions clause);[3] (2) "SC-2 Location," which, in

---

[2] The actual boring logs appear in appendix C.

[3] "GC-35 Changed Conditions At The Jobsite," as required by section 7104, reads as follows: "The Contractor shall immediately, and before the conditions are disturbed, notify the Field Representative of the Engineer in writing, with a copy to the Engineer of: (1) Subsurface or latent physical conditions at the jobsite differing materially from those indicated in this Contract, or (2) unknown physical conditions at the jobsite, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this Contract. The Field Representative of the Engineer will promptly investigate the conditions and notify the Engineer of the findings. If the Engineer determines that, in accordance with the Contract Documents, such conditions are unusual and

addition to specifying the location of the powerhouse, informed Condon-Johnson that SMUD would not make extra payment if the contractor failed to determine existing conditions and that SMUD made no guarantee concerning information not included in the plans and specifications and information provided by others, including SMUD personnel, about the conditions which may impact the work and/or costs;[4] and (3) "SC-10 Subsurface Soil Conditions" (which was also addendum No. 1), the beginning paragraphs of which informed Condon-Johnson that compression tests of two boring samples "adjacent to the jobsite" taken "for the p[ur]pose of determining what type [of] rock may be encountered" measured 7,300 pounds per square inch (psi) from a depth of 20 feet and 3,600 psi from a depth of 25.7 feet,[5] and the final paragraph of which informed Condon-Johnson it was solely responsible for evaluating the jobsite and assessing the subsurface soil conditions and that SMUD did not guarantee the soil report's accuracy and would make no

---

materially different and cause an increase or decrease in the cost of the work or time required for the performance of this Contract, an equitable adjustment shall be made as provided under GC-30 CHANGES IN WORK. Time or cost adjustments will not be allowed unless the Contractor has given proper notice as specified above."

[4] "SC-2 Location," reads as follows: "[¶] . . . [¶] Failure of the Contractor to acquaint themselves with all available information regarding any applicable conditions will not relieve them from the responsibility for properly assessing either the difficulties or the costs of successfully performing the work. No extra payment will be made for the Contractor's failure to determine existing conditions.

"The District assumes no responsibility and makes no guarantee concerning information not included in the plans and specifications or information provided by others, including District personnel, about the general and local conditions which may impact the work and/or costs."

[5] The beginning paragraphs of "SC-10 Subsurface Soil Conditions" read as follows: "[¶] . . . [¶] Subsurface Investigation: The District has performed soil boring along the penstock, adjacent to the jobsite. The boring logs are provided in Appendix C. The core samples taken from these borings will be available for viewing during the pre-bid site visit. Note that these bore locations are actually closer to the powerhouse than the proposed pier locations. Based on the historical photo, included in the Technical Conditions, the District expects much less backfill at pier locations as compared to the sample locations. It is the inten[t]ion of the District to provide the soil boring information for the p[ur]pose of determining what type [of] rock may be encountered and not for determining the profile of the backfill to rock.

"The District has completed compression testing on two samples from the M-2 boring, at 20.0 and 25.7 feet. These tests were completed to give additional information as to what may be expected in the pier drilling. These samples were selected, by the District, on the basis of visually appearing to be the most competent core samples in the M-1 and M-2 recovery. Visually these samples were free of fractures and the geotech's physical description is as recorded for 20.0 and 25.7 foot depths of the M-2 core log. The compression test results are as follows:

"M-2 @ 20.0 ft—7300 psi;

"M-2 @ 25.7 ft—3600psi

"The District monitors a well behind the powerhouse for ground water elevation. In the spring the ground water elevation behind the powerhouse tends to be about 40 feet below existing grade. By autumn, as runoff recedes, the ground water typically drops close to river elevation approximately 50 feet below the existing grade behind the powerhouse."

additional payments or accept any clams if the soil conditions were different from that assumed by Condon-Johnson.[6]

Not included in the contract, request for proposal, or addenda to the contract were five prior reports regarding the Camino powerhouse, at least one of which reported seismic velocities between 9,000 and 12,000 feet per second.

In August 2002, Condon-Johnson began work on the project. In the early stages of drilling, Condon-Johnson encountered rocks it suspected were harder than 3,500 to 7,300 psi, and tests confirmed the rock strength was 13,070 psi. Condon-Johnson informed SMUD it had encountered changed conditions and made a claim for additional money pursuant to the changed conditions clause. SMUD denied the claim based on its determination the contract did not represent a condition so there was no changed condition.

Condon-Johnson filed suit against SMUD alleging breach of contract, negligent misrepresentation, and negligent concealment arising out of SMUD's refusal to pay for the changed conditions and misrepresentation and concealment of the actual conditions at the jobsite.[7]

Prior to trial, Condon-Johnson filed two motions in limine to exclude evidence of the disclaimers in the contract. The first motion sought to exclude the final paragraph of SC-10 because it was inconsistent with the rock strength representations and the changed conditions clause required by section 7104. The second motion sought to exclude the disclaimers because they could not be relied on to rebut claims that a public entity negligently misrepresented and concealed the subsurface conditions.

The trial court granted both motions "for reasons set forth in the moving papers, the authorities cited in those papers, the discussions . . . on the record, and all related matters." The court's comments during these discussions

---

[6] The final paragraph of "SC-10 Subsurfac[e] Soil Conditions" reads as follows:

"It is the sole responsibility of the Contractor to evaluate the jobsite and make his own technical assessment of subsurface soil conditions for determining the proposed drilling process, equipment and make his own financial impact assessment prior to bidding. The District makes no guarantee for the soil report[']s accuracy, findings or recommendations. The District will make no additional compensation or payments, nor will it accept any claims if the subsurface soil conditions are different from that assumed by the Contractor."

[7] SMUD filed a cross-complaint under the False Claims Act (Gov. Code, § 12650 et seq.) and filed an appeal from an adverse judgment. For reasons set forth in the text the SMUD claims are rendered moot.

reflected its belief that section 7104 and the changed conditions clause were "patently incompatible," and the disclaimers were unenforceable because the contract also provided that state law prevailed over any conflicting contract clause. The trial court's comments also seemed to say that if the disclaimers were excluded on the contract claim, they would also be excluded on the noncontract claims, even if relevant, to avoid confusing the jury.

At trial, the disclaimers in the contract and reference to the disclaimers in correspondence between SMUD and Condon-Johnson were excised from the exhibits, including: (1) the language in SC-2 that SMUD would not make extra payment if the contractor failed to determine existing conditions and that SMUD made no guarantee concerning information provided by SMUD personnel about the conditions which may impact the work and/or costs; (2) the final paragraph in SC-10 that Condon-Johnson was solely responsible for evaluating the jobsite, assessing the subsurface soil conditions, and SMUD did not guarantee the soil report's accuracy and would make no additional payments or accept any claims if the soil conditions were different from those assumed by Condon-Johnson; (3) SMUD's quotation of the final paragraph in SC-10 in a letter to Condon-Johnson dated October 11, 2002, in response to Condon-Johnson's request for equitable adjustment to the contract based on changed conditions; and (4) SMUD's reference to Condon-Johnson's failure to adequately investigate the subsurface soil conditions in letters to Condon-Johnson dated November 1, 2002, and November 7, 2002.

With this information excised from the exhibits, Condon-Johnson prevailed at trial and obtained a jury verdict of $1,265,166. The court awarded Condon-Johnson $265,165 in prejudgment interest and $105,190.79 in costs on the contract, negligent misrepresentation and negligent failure to disclose claims, and entered judgment in favor of Condon-Johnson for $1,635,521.79.

SMUD filed a timely notice of appeal from the judgment and on appeal argues the trial court erred as a matter of law in interpreting section 7104 to preclude evidence of the disclaimers. We will affirm the judgment.

## DISCUSSION

The sole issue on appeal is whether the trial court abused its discretion in granting the motions in limine and in excluding evidence of the disclaimers in the contract regarding the subsurface conditions at the jobsite.

SMUD does not claim the judgment otherwise is in error. In particular SMUD does not claim that Condon-Johnson did not draw a fair inference from the representations and soil boring information in the contract as to the actual subsurface conditions at the jobsite.

So framed the case turns on the meaning of the term "indicated" in section 7104, as incorporated in the changed conditions provisions of the contract, and on the construction of the contract in the light of that meaning.[8]

I

Standard of Review

At the outset SMUD argues we should review the court's rulings on the in limine motions pursuant to a de novo standard of review, while Condon-Johnson argues for an abuse of discretion standard. On this point we agree with SMUD.

"A motion *in limine* is made to exclude evidence before the evidence is offered at trial, on grounds that would be sufficient to object to or move to strike the evidence. The purpose of a motion *in limine* is 'to avoid the obviously futile attempt to "unring the bell" in the event a motion to strike is granted in the proceedings before the jury.' " (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 26 [61 Cal.Rptr.2d 518].) Generally, a trial court's ruling on an in limine motion is reviewed for abuse of discretion. (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1493 [21 Cal.Rptr.3d 36].) However, when the issue is one of law, we exercise de novo review. (*Siegel v. Anderson Homes, Inc.* (2004) 118 Cal.App.4th 994, 1000 [13 Cal.Rptr.3d 462].)

Condon-Johnson's first in limine motion sought to exclude evidence of the disclaimers on the breach of contract claim because the disclaimers violated section 7104. The second in limine motion sought to exclude the same evidence on the alternative claims of negligent misrepresentation and negligent concealment based on an argument the disclaimers could not be relied on to rebut these claims.

Since the validity of the in limine motions turns on the meaning of "indicated" in section 7104, subdivision (a)(2), a question of statutory construction, it tenders a question of law to be reviewed by us de novo. (See fn. 8, *ante.*)

---

[8] As noted above, the trial court excluded the disclaimers on the contract claim on the ground they were in violation of section 7104 and excluded the disclaimers on the noncontract claims to avoid confusing the jury. In view of our resolution of the case under section 7104 we have no occasion to consider the noncontract claims separately.

II

Section 7104

SMUD claims the disclaimers must be read together with the substantive provisions of the contract in order to determine what was indicated. The answer turns on the meaning of the term "indicated" in section 7104.[9]

██ Under section 7104, subdivision (b), SMUD was required to issue a change order increasing the payments to Condon-Johnson when the subsurface conditions materially differed from those "indicated" in the contract. (§ 7104, subds. (a)(2) & (b).) The section was enacted in 1989 and was preceded in 1967 by two California Supreme Court cases that addressed the standard for determining what representations concerning subsurface conditions in a public works contract may be relied upon by the contractor in making a bid. (Stats. 1989, ch. 330, § 1, p. 1435; *E. H. Morrill Co. v. State of California* (1967) 65 Cal.2d 787 [56 Cal.Rptr. 479, 423 P.2d 551]; *Wunderlich v. State of California* (1967) 65 Cal.2d 777 [56 Cal.Rptr. 473, 423 P.2d 545].)

In *Wunderlich* the state was made liable in the trial court for breach of an implied warranty regarding the quantity of gravel that could be obtained from

---

[9] Section 7104 currently provides in full:

"Any public works contract of a local public entity which involves digging trenches or other excavations that extend deeper than four feet below the surface shall contain a clause which provides the following:

"(a) That the contractor shall promptly, and before the following conditions are disturbed, notify the local public entity, in writing, of any:

"(1) Material that the contractor believes may be material that is hazardous waste, as defined in Section 25117 of the Health and Safety Code, that is required to be removed to a Class I, Class II, or Class III disposal site in accordance with provisions of existing law.

"(2) Subsurface or latent physical conditions at the site differing from those indicated by information about the site made available to bidders prior to the deadline for submitting bids.

"(3) Unknown physical conditions at the site of any unusual nature, different materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the contract.

"(b) That the local public entity shall promptly investigate the conditions, and if it finds that the conditions do materially so differ, or do involve hazardous waste, and cause a decrease or increase in the contractor's cost of, or the time required for, performance of any part of the work shall issue a change order under the procedures described in the contract.

"(c) That, in the event that a dispute arises between the local public entity and the contractor whether the conditions materially differ, or involve hazardous waste, or cause a decrease or increase in the contractor's cost of, or time required for, performance of any part of the work, the contractor shall not be excused from any scheduled completion date provided for by the contract, but shall proceed with all work to be performed under the contract. The contractor shall retain any and all rights provided either by contract or by law which pertain to the resolution of disputes and protests between the contracting parties."

a gravel pit for use in the construction of a highway, predicated upon inferences as to the quantity of the gravel drawn from averaging two test borings of the pit by the state. The Supreme Court reversed the judgment saying that, while the test borings accurately stated the proportion of sand to gravel found, the state made "no representation as to quantities [of gravel] in the source, or that a consistent proportion of materials would be found throughout the source." (*Wunderlich v. State of California, supra*, 65 Cal.2d at p. 783; see also *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 291–292 [85 Cal.Rptr. 444].) The contract expressly disclaimed "any representation as to the quantity of materials" in the source. (*Wunderlich, supra*, at p. 785.)

*E. H. Morrill*, decided on the same day by the *Wunderlich* author, said of that case "that the state is not liable for conclusions drawn by a bidder when the state has done little more than represent the results of its investigations and the bidder knew or should have known of the factual bases for the representations. . . . [T]here was no positive assertion of fact as to [the subsurface] condition; in addition, the very section in which the statement was made was prefaced by a reference to disclaimer provisions that clearly sought to avoid the state's responsibility for the factual conclusion which the contractor chose to deduce from the statement." (*E. H. Morrill Co. v. State of California, supra*, 65 Cal.2d at p. 791.)

Of significance for the meaning of "indicated" in section 7104, the court in *Wunderlich* said " '[t]he borings were merely indications, . . . from which deductions might be drawn as to actual conditions. . . .' " (*Wunderlich v. State of California, supra*, 65 Cal.2d at p. 784.) The court said an implied warranty extended only to the accuracy of the borings and not to deductions drawn from them. (*Id.* at p. 785.)

By contrast, in *E. H. Morrill Co.* the contract provided that "[b]oulders which may be encountered in the site grading and other excavation work on the site *vary in size from one foot to four feet in diameter. The dispersion of boulders varies from approximately six feet to twelve feet in all directions, including the vertical.*" (*E. H. Morrill Co. v. State of California, supra*, 65 Cal.2d at pp. 789–790.) The court said these were "positive assertion[s] of fact" from which the contractor could calculate the quantity of material and " '[are] not overcome by the general clauses requiring the contractor, to examine the site . . . [and] to assume responsibility for the work.' " (*Id.* at p. 793.)

*Wunderlich* and *Morrill* thus distinguished between "positive assertion[s] of fact" and "indications," information from which an inference of the actual subsurface conditions may be drawn. Thus, when the Legislature enacted section 7104 in 1989 and used the word "indicated," the past tense of "indications," rather than "positive assertions" it selected a term recognized in the cases as referring to information "from which deductions might be drawn as to actual conditions . . . ." It follows that section 7104 establishes, as the public policy of California, that a contractor may draw reasonable deductions from the "indications" in a contract of the subsurface conditions that might be found at the site.

"The crucial question is . . . one of justified reliance." (*Wunderlich v. State of California, supra,* 65 Cal.2d at p. 783.) Upon what information provided by a public entity can a contractor bidding on a local public works project rely in making a bid? The nature and accuracy of the information provided by the public entity manifestly bears on the risks to be undertaken by the bidder. To that extent the risk affects the amount of the bid. The more risk the greater the bid. Accordingly, it is to a public entities' advantage to provide information upon which the bidder can rely in order to obtain the lowest qualified bid. (See Gibbs & Hunt, Cal. Construction Law (16th ed. 2000) § 6.11, p. 240.)

It is apparent that the Legislature has allocated the risks between public entity and contractor in enacting section 7104, subdivision (a)(2) as a matter of public policy. That is manifest not only in determining the measure of reliability as that "indicated" in the contract but also in placing the risk of unknown and unusual conditions upon the public entity in subdivision (a)(3).

### III

### The Subsurface Conditions Indicated

The question is whether the SMUD contract "indicated" the subsurface conditions from which the contractor might draw a reasonable deduction of the actual conditions at the site of the work, thereby requiring SMUD to comply with section 7104, subdivision (b).

Determining whether the contract and related documents indicated the subsurface conditions at the jobsite, within the meaning of section 7104, subdivision (b), is a matter of contract interpretation and thus presents a question of law which may be decided by this court for itself. (See *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839] [it is "solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence"].)

However, since the changed conditions clause of the contract incorporates the provisions of section 7104, subdivision (b), the ultimate question is one of statutory construction.

As noted the contract provided that "[t]he District has completed compression testing on two samples from the M-2 boring, at 20.0 and 25.7 feet. These tests were completed to give additional information as to what may be expected in the pier drilling. These samples were selected, by the District, on the basis of visually appearing to be the most competent core samples in the M-1 and M-2 recovery." The contract explained the purpose of providing the compression testing results. "It is the inten[t]ion of the District to provide the soil boring information for the p[ur]pose of determining what type [of] rock may be encountered and not for determining the profile of backfill to rock." The references to the "type [of] rock [that] may be encountered" and "information as to what may be expected in the pier drilling" obviously mean the type of rock to be encountered in the performance of the work, i.e., the type of rock at the jobsite.

Although the test borings were made "adjacent to the jobsite," the representations made in the contract justified Condon-Johnson in inferring that such rock would also be found at the jobsite and could be relied upon in making its bid.

SMUD's argument is that the disclaimers should be taken into account in reading the contract. While that may be true if the disclaimer aids in the construction of that indicated regarding the test borings, it does not if the disclaimer conflicts with that indicated.

SMUD argues, in effect, that the disclaimers trump what the contract asserts the contractor may encounter or may expect to find at the jobsite, that what is "indicated" should not be taken into account in the bidding. SMUD says that "under the Contract, the successful bidder, Condon-Johnson, had the sole responsibility for determining the subsurface conditions at the specific location of the Project" no matter what the contract otherwise provided. That is also the point made by our dissenting colleague.

██ However, even under the law preceding the adoption of section 7104, a general disclaimer could not overcome positive assertions of fact regarding subsurface conditions upon which the contractor was entitled to rely. (See *E. H. Morrill Co. v. State of California, supra,* 65 Cal.2d at p. 793.) Adjusting the *Morrill* analysis to substitute the required statutory standard of "indicated" for positive assertions of fact, the disclaimer in this case is precisely the kind of general disclaimer condemned in the *Morrill* case.

The contract provides that "[i]t is the sole responsibility of the Contractor to evaluate the jobsite and make his own technical assessment of subsurface soil conditions for determining the proposed drilling process, equipment and make his own financial impact assessment prior to bidding. The District makes no guarantees for the soil reports accuracy, findings or recommendations. The District will make no additional compensation or payments, nor will it accept any claims if the subsurface soil conditions are different than that assumed by the Contractor."

This language says that contractors cannot rely upon the soil boring information contrary to the stated purpose of the contract "to provide the soil boring information for the p[ur]pose of determining what type [of] rock may be encountered" and contrary to the implication that they may "acquaint themselves" with the information for the purpose of assessing the costs of the project. But, of course, it is the very purpose of the information provided, or in the language of section 7104—"indicated," to assist the contractor in making a bid.

■ To disclaim what is "indicated" runs counter to the requirements of section 7104 and its embodiment in the changed conditions provision of the contract, that if the subsurface physical conditions materially differ from that indicated in the contract, the public entity shall issue a change order effecting a change in the bid price.

Lastly, SMUD argues that the contract provides that contractors must "acquaint themselves with all available information" and the failure to do so will not relieve them of the responsibility of properly assessing the costs of the work. However, this does not rule out Condon-Johnson's reliance on the boring information since that is part of the information which it must consider in making a bid. It is only the failure to do so that does not relieve the contractor of responsibility.

## DISPOSITION

The judgment is affirmed. Condon-Johnson shall recover its costs on appeal. (Cal. Rules of Court, rule 8.276.)

Cantil-Sakauye, J., concurred.

**ROBIE, J.,** Dissenting.—With regard to part III of the Discussion in the majority opinion and the disposition, I respectfully dissent.

As the majority recognizes, the crucial question here in determining whether Sacramento Municipal Utility District (SMUD) breached its contract with Condon-Johnson & Associates Inc. (Condon-Johnson) is whether the subsurface conditions Condon-Johnson encountered at the jobsite were different than those "indicated" by SMUD, which, of course, requires a determination of whether SMUD "indicated" anything at all in its contract about subsurface conditions at the site. SMUD contends the disclaimers are essential to determining what, if anything, the contract "indicated" about subsurface conditions at the site. I agree.

One of the most fundamental principles of contract interpretation is that "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641; see also *id.*, § 3541 ["An interpretation which gives effect is preferred to one which makes void"].) Thus, in construing the SMUD contract to determine what, if anything, it "indicated" about subsurface conditions at the site, we are required to make every effort reasonably possible to give meaning and effect to every clause in the contract. (See *Bank of Stockton v. Diamond Walnut Growers, Inc.* (1988) 199 Cal.App.3d 144, 158 [244 Cal.Rptr. 744] ["We read the contract as a whole, giving effect, if reasonably practicable, to every part . . . . Apparent repugnancy must be reconciled, if possible, by an interpretation that gives some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract" (citations omitted).]

Unfortunately, the trial court failed to heed that rule (hence this appeal), and the majority in this court now follows suit. Essentially, in determining what the contract "indicated" about subsurface conditions at the site, the majority reads what SMUD communicated in the contract about the results of its subsurface investigation[1] *in isolation* from the surrounding contract language. Only after satisfying itself that SMUD's test results were intended to "indicate" the type of rock at the jobsite does the majority consider the disclaimer language that follows only two paragraphs later, at the end of the very same section (headed "Subsurface Investigation"), beginning on the very same page. Of course, having already decided what the contract "indicated" about subsurface conditions, it is a foregone conclusion that the majority will reject the disclaimer as being in conflict with those "indications."

---

[1] SMUD obtained two core samples (M-1 and M-2) from locations "along the penstock, adjacent [to] the jobsite," but "closer to the powerhouse than the proposed pier locations." SMUD then performed compression tests on two samples from the M-2 boring and communicated those test results to potential bidders in the contract. The core samples themselves were also to be made available for viewing during the prebid site visit.

In my view, what the law requires us to do is attempt to reconcile the paragraph setting forth the test results and the disclaimer language that follows, if possible, in determining what the contract "indicated" about subsurface conditions. In doing this, it is important to understand the impact of the changed conditions provisions required by Public Contract Code section 7104. Essentially, those provisions require the public entity to *guarantee* the existence of whatever subsurface conditions are "indicated" in the contract. If the conditions encountered are materially different from those "indicated," resulting in an increase in the cost of the work, then the public entity must pay that increased cost.

It seems self-evident to me that the very purpose of a disclaimer like the one contained in the "Subsurface Investigation" section of the SMUD contract is to protect the public entity from the risk of having to pay any such increased cost by ensuring that the contract does not "indicate" anything about subsurface conditions at the site. Thus, while disclosing what information it has about the subsurface conditions that may be found at the site, the public entity goes on to *disclaim* any intent to actually "indicate" what subsurface conditions will, in fact, be found there. This is not inconsistent with Public Contract Code section 7104, because the contract still contains the changed circumstances provision required by that statute; the public entity has simply ensured that provision will not be triggered because the public entity is not "indicating" what the subsurface conditions are at the site.

In my view, that is the only reasonable reading of the SMUD contract under the circumstances, if we are (as required by law) to read the contract as a whole. Although the "Subsurface Investigation" section of the contract provides "soil boring information [drawn from locations near, but not at, the jobsite] for the p[ur]pose of determining what type [of] rock may be encountered," that section also makes clear that "[i]t is the sole responsibility of the Contractor to evaluate the jobsite and make his own technical assessment of subsurface soil conditions for determining the proposed drilling process, equipment and make his own financial impact assessment prior to bidding." The same section of the contract goes on to make clear that "[t]he District makes no guarantees for the soil reports accuracy, findings or recommendations" and "will make no additional compensation or payments, nor will it accept any claims if the subsurface soil conditions are different from that assumed by the Contractor." Read together, these provisions provide the bidders information about what subsurface conditions may exist at the site, but do not "indicate" the actual conditions for purposes of the changed conditions provision required by Public Contract Code section 7104.

This conclusion is consistent with prior California law on the subject. (See *Wunderlich v. State of California* (1967) 65 Cal.2d 777, 784–786 [56 Cal.Rptr. 473, 423 P.2d 545] [where a section of the contract suggested that samples taken from a pit contained suitable materials, but the same section contained direct references to disclaimer paragraphs and to a specific disclaimer of the attributes of the source allegedly warranted, the disclaimer provisions controlled and there was no positive representation on which the contractor could justifiably rely].)

Relying on *E. H. Morrill Co. v. State of California* (1967) 65 Cal.2d 787 [56 Cal.Rptr. 479, 423 P.2d 551]—a case decided the same day as *Wunderlich*— the majority contends "a general disclaimer [cannot] overcome assertions regarding subsurface conditions upon which the contractor [i]s entitled to rely." However, the facts of *E. H. Morrill Co.* are readily distinguishable from the facts here, and the distinction only serves to prove why the majority's interpretation of SMUD's contract is incorrect.

The contract at issue in *E. H. Morrill Co.* contained a "SPECIAL SITE CONDITIONS" clause that informed the contractor in relevant part as follows: "Boulders which may be encountered in the site grading and other excavation work on the site vary in size from one foot to four feet in diameter. The dispersion of boulders varies from approximately six feet to twelve feet in all directions, including the vertical." (*E. H. Morrill Co. v. State of California, supra,* 65 Cal.2d at pp. 789–790, italics omitted.) There was also a general disclaimer in another part of the contract purporting to disclaim liability for " 'additional compensation for any obstacles or difficulties due to surface or subsurface conditions actually encountered.' " (*Id.* at p. 790.)

The trial court sustained "the state's demurrer to a complaint for damages for the costs of performing additional subsurface rock excavation pursuant to the contract" on the ground that, because of the disclaimer, "the state as a matter of law could not be deemed to have warranted the condition of the job site by its representations in [the 'SPECIAL SITE CONDITIONS' clause]." (*E. H. Morrill Co. v. State of California, supra,* 65 Cal.2d at pp. 789–790.) On review, the Supreme Court determined that the trial court erred in construing the general disclaimer provision "to be as a matter of law an effective disclaimer of the representation of site conditions in [the 'SPECIAL SITE CONDITIONS' clause]." (*Id.* at p. 791.) The court distinguished *Wunderlich* by noting that in that case "there was no positive assertion of fact as to condition; in addition, the very section in which the statement [of condition] was made was prefaced by a reference to disclaimer provisions

that clearly sought to avoid the state's responsibility for the factual conclusion which the contractor chose to deduce from the statement." (*E. H. Morrill Co. v. State of California, supra,* 65 Cal.2d at p. 791.)

Later, the court emphasized this point, as follows: "It appears from the opinion in *Wunderlich* that disclamatory provisions may be considered in determining whether the statement alleged to constitute a warranty of condition is so in fact, especially when the statement is not cast in the form of a positive assertion of fact. [Citation.] In the instant case, however, nothing in [the 'SPECIAL SITE CONDITIONS' clause], which purports to make a positive assertion of fact as distinguished from *Wunderlich,* in any way draws the attention of the bidder to the purported disclaimer [elsewhere in the contract]. Although, of course, the contract must be read as a whole, the absence of any cross-reference may be of significance in a determination by the finder of fact whether [the general disclaimer] would justify the bidder in relying upon the unqualified representation of specified site conditions. It 'would be going quite too far to interpret the general language of the other [sections of the contract] as requiring independent investigation of facts which the specifications furnished by the government as basis of the contract left in no doubt . . . . In its positive assertion of the nature of this much of the work [the government] made a representation upon which the claimants had a right to rely without an investigation to prove its falsity.' . . . [¶] . . . Accordingly, the language in [the general disclaimer provision] requiring the bidder to 'satisfy himself as to the character . . . of surface and subsurface materials or obstacles to be encountered' cannot be relied upon to overcome those representations as to materials and obstacles which the state positively affirms in [the 'SPECIAL SITE CONDITIONS' clause] not to exist . . . ." (*E. H. Morrill Co. v. State of California, supra,* 65 Cal.2d at pp. 792–793, italics & citations omitted.)

In my view, the facts of this case are comparable to those in *Wunderlich* and not to those in *E. H. Morrill Co.* The soil boring information in the "Subsurface Investigation" section of the SMUD contract did not amount to a "positive assertion of fact" as to the subsurface conditions to be encountered at the jobsite, like the state's representations about the size and dispersion of boulders in *E. H. Morrill Co.* Indeed, the SMUD contract specifically noted that the core samples SMUD tested were from a location "*adjacent* to the jobsite" and that those samples were tested "to give additional information as to what *may* be expected in the pier drilling." (Italics added.) Moreover, unlike the state in *E. H. Morrill Co.,* SMUD does not rely on a general disclaimer contained in an entirely different part of the contract to escape liability for additional costs, but instead relies on a specific disclaimer contained in the very same provision as the representations about its subsurface investigation, similar to the situation in *Wunderlich.*

Based on the foregoing analysis, I conclude that to give effect to every part of the contract, it must be read as a matter of law as not "indicating" any particular subsurface conditions at the jobsite. Thus, I would reverse the judgment in favor of Condon-Johnson.

A petition for a rehearing was denied May 8, 2007, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 25, 2007, S153004. Werdegar, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.