Filed 2/8/16 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WILLIAM JAE KIM et al., | B247672 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. VC059206) |
| v. | |
| TOYOTA MOTOR CORPORATION et al., | **ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT; PETITION FOR REHEARING DENIED** |
| Defendants and Respondents. | |

The opinion filed January 19, 2016, and certified for publication, is modified as follows:

1. On the title page, the listing of counsel for defendants and respondents was listed as: "RoganLehrman, Patrick Rogan, Daniel R. Villegas; Bingham McCutchen, Robert A. Brundage and Nicolette L. Young for Defendants and Respondents."

It should read: "RoganLehrman, Patrick Rogan, Daniel R. Villegas; Bingham McCutchen, Morgan, Lewis & Bockius, Robert A. Brundage and Nicolette L. Young for Defendants and Respondents."

This order does not change the judgment. Respondents' petition for rehearing is denied.

| | | |
|---|---|---|
| PERLUSS, P. J. | ZELON, J. | SEGAL, J. |

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| WILLIAM JAE KIM et al., | B247672 |
|     Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. VC059206) |
|     v. | |
| TOYOTA MOTOR CORPORATION et al., | |
|     Defendants and Respondents. | |


        APPEAL from a judgment of the Superior Court of Los Angeles County, Raul A. Sahagan, Judge.  Affirmed.

        Law Offices of Ian Herzog, Ian Herzog, Thomas F. Yuhas and Evan D. Marshall for Plaintiffs and Appellants.

        RoganLehrman, Patrick Rogan, Daniel R. Villegas; Bingham McCutchen, Robert A. Brundage and Nicolette L. Young for Defendants and Respondents.

_____

## INTRODUCTION

William Jae Kim (Kim) and Hee Joon Kim appeal from a judgment after a jury trial in favor of Toyota Motor Corporation and other defendants in this strict products liability action. Kim lost control of his 2005 Toyota Tundra pickup truck when he swerved to avoid another vehicle on the Angeles Forest Highway, drove off the road, and suffered severe injuries. The Kims alleged that the accident occurred because Kim's Tundra lacked electronic stability control (ESC), also known as vehicle stability control (VSC), and that the absence of this device or system was a design defect.

The Kims challenge the trial court's denial of their motion in limine to exclude evidence that the custom of the automotive industry was not to include ESC as standard equipment in pickup trucks. In rejecting this challenge, we part company with one line of cases stating that evidence of industry custom and practice is always inadmissible in a strict products liability action, and with a recent case suggesting such evidence is always admissible. Instead, we hold that evidence of industry custom and practice may be admissible in a strict products liability action, depending on the nature of the evidence and the purpose for which the proponent seeks to introduce the evidence. Because the Kims moved to exclude all such evidence, the trial court properly denied their motion in limine. We also conclude that the trial court's evidentiary rulings and imposition of a time limit on the duration of rebuttal argument were not an abuse of discretion, and that the court properly refused the Kims' proposed jury instructions on federal safety standards and industry custom. We therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Accident*

On April 20, 2010, shortly before 6:00 p.m., Kim was driving his 2005 Tundra truck northbound on the Angeles Forest Highway. The road was wet, and Kim was descending a curve at approximately 45 to 50 miles per hour, when a car driving toward

2

him in the opposite direction crossed part way over the center line. According to Kim, he steered right to avoid the other vehicle. Kim's two right tires veered onto the gravel shoulder. Kim then steered left to return to the asphalt, but his truck turned too far to the left and his tires slipped. Steering right again, Kim lost control of his truck. He drove off the highway and over an embankment. The truck rolled onto its roof and back onto its wheels, and came to rest near the bottom of the embankment. Firefighters extricated Kim from the vehicle. He suffered a serious neck injury and damage to his spinal cord.

B.    *The Complaint and the Motions In Limine*

The Kims filed a complaint against Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., Toyota Motor North America, Inc., Toyota Motor Engineering & Manufacturing North America, Inc., and Power Toyota Cerritos, Inc. (collectively Toyota). The Kims alleged causes of action against all of the defendants for strict products liability, negligence, breach of express and implied warranties, and loss of consortium.[1] The Kims alleged that the accident occurred because Kim's Tundra lacked VSC and Toyota engineers had decided to offer VSC only as an option rather than equipping all 2005 Tundra trucks with VSC as standard equipment.[2] The Kims alleged that the absence of VSC was a design defect.

Prior to trial, the Kims filed several motions in limine, including the one involved in this appeal, motion in limine No. 4. The motion asked the court to preclude Toyota from introducing any evidence "comparing the Tundra to competitor's vehicles and designs," which effectively excluded all evidence of custom and practice in the pickup truck industry, and any evidence that Toyota's "design choices were not

---

[1]    The Kims voluntarily dismissed their negligence and breach of warranty causes of action before trial.

[2]    Electronic stability control (ESC) is the generic term. Toyota's ESC system is known as VSC.

3

defective . . . because they were equivalent or superior to those of its competitors." [3] The Kims filed a companion motion, motion in limine No. 9, which sought to preclude "any argument, evidence or testimony" that the 2005 Tundra was not defective because it complied with Federal Motor Vehicle Safety Standards (FMVSS). The trial court denied both motions, but stated that the Kims could request an appropriate limiting instruction.

C. *The Trial, Verdict, Judgment, and New Trial Motion*

At trial the Kims presented the testimony of several percipient and expert witnesses. Steven Meyer, a mechanical engineer and accident reconstructionist, described the sequence of events preceding the accident. Meyer also stated that the tires were worn, but the treads were adequate. Michael Gilbert, a mechanical engineer, testified that ESC senses when the rear of a vehicle begins to swing out and responds by applying the brakes to a front tire in order to avoid fishtailing and to help the driver maintain control. ESC also senses when the front tires are slipping and applies rear braking to correct the vehicle's rotation. ESC takes the driver's steering input into account and helps to keep the vehicle in alignment. Gilbert stated his opinion that ESC would have prevented Kim's accident. Yiannis Papelis, a computer engineer the Kims called to give an opinion about whether VSC would have prevented the accident, testified that ESC helps to correct oversteering, and that ESC was designed to prevent exactly the kind of loss of control that occurred in this case. He stated his opinion that, despite the wet roadway and the worn tire treads, ESC would have prevented Kim from losing

---

[3] The Kims argue that they "never asserted that evidence of other vehicles or of technical standards is categorically inadmissible in a strict liability case." By seeking to exclude all evidence comparing the Tundra competitor's vehicles, however, the Kims sought to exclude all evidence of other comparable vehicles. The Kims also assert that motion in limine No. 4 "objected to exactly the evidence at issue on appeal: evidence that the Tundra was 'equivalent or superior to those of its competitors.'" But that was only part of what the Kims moved to exclude. They also moved to exclude, in the part of the motion not quoted by the Kims, all evidence "comparing the Toyota Tundra to competitor[s'] vehicles and designs."

4

control of his truck.  Murat Okcuoglu, a mechanical engineer, testified that the incremental cost to include ESC in a Tundra in 2005 was $300 to $350 per truck.

The Kims also called Sandy Lobenstein, Toyota's product planning manager, as an adverse witness.  He stated that Toyota's product planning group made recommendations, based on information and research from customers, dealers, and field offices, regarding what features Toyota should make available on its vehicles. Lobenstein testified that Toyota offered VSC as standard equipment in some sport utility vehicles beginning in 2001 or 2004, and made VSC available as an option for the Tundra in the 2004 and 2005 models, "so the customer[s] had the choice whether they had VSC on their vehicle or not."  He acknowledged that Toyota engineers had recommended making VSC standard equipment for the Tundra.  Lobenstein stated that no other manufacturer offered ESC as standard equipment in full-size pickup trucks at that time and that customers prioritized other features.

Toyota also presented the testimony of several percipient and expert witnesses. Percipient witnesses testified that the roadway was moderately wet and there was wet gravel in places contributing to poor driving conditions.  Dale Dunlap, a civil engineer, testified that the maximum speed for driving comfortably on the curve under the applicable guidelines was approximately 35 miles per hour.  Lee Carr, an engineer, testified that Kim caused the accident by driving at an excessive rate of speed given the conditions of his truck and the road.  Carr stated that VSC responds to the driver's steering inputs and that, given Kim's steering to the left, VSC would not have prevented his loss of control.  Douglas Young, a kinesiologist, challenged Papelis's analysis and refuted Papelis's conclusions regarding the effectiveness of VSC in these circumstances.

In response to questioning by counsel for Toyota, Lobenstein again stated that no other manufacturer offered ESC as standard equipment for pickup trucks in 2005 and testified that the Tundra was the first pickup truck with ESC available as an option.  He stated that truck manufacturers first offered other safety features involving expensive emerging technologies, such as backup cameras and pre-collision sensors, as options rather than as standard equipment.

5

After nine days of trial, the trial court instructed the jury on the Kims' strict products liability claim. The court gave the jury an instruction on the design defect risk-benefit test, CACI No. 1204, but refused the Kims' proposed instruction on the consumer expectations test, CACI No. 1203. The court also refused the Kims' proposed special instruction that it was "no defense that the design of the Tundra complied with Federal Motor Vehicle Safety Standards, or that the design met the standards of the motor vehicle industry at the time the Tundra was produced, or that Toyota's competitors sold vehicles that were no safer than the Tundra, or had the same design defects, or lacked the same safety equipment."

The jury found that the Toyota Tundra did not have a design defect. The trial court entered a judgment in favor of Toyota based on the jury verdict.

The Kims moved for a new trial, arguing that the trial court had erred by admitting certain evidence, excluding other evidence, rejecting their proposed jury instructions, and cutting off their rebuttal argument without giving their attorneys adequate warning. The trial court denied the motion. The Kims timely appealed from the judgment.

## DISCUSSION

A.    *The Trial Court Did Not Abuse Its Discretion by Denying the Kims'*
      *Motion In Limine To Exclude All Evidence of Industry Custom and Practice*

The Kims argue that the trial court erred by denying their motion in limine No. 4 and refusing to preclude Toyota from introducing any evidence that its competitors did not provide ESC as standard equipment in pickup trucks. The Kims argue that evidence of industry custom and practice is irrelevant, unduly prejudicial, and inadmissible as a matter of law in a strict products liability action.

6

"Generally, a trial court's ruling on an in limine motion is reviewed for abuse of discretion. [Citation.] However, when the issue is one of law, we exercise de novo review." (*Condon-Johnson & Associates, Inc. v. Sacramento Municipal Utility Dist.* (2007) 149 Cal.App.4th 1384, 1392; accord, *Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1277; see *McIntyre v. Colonies-Pacific, LLC* (2014) 228 Cal.App.4th 664, 670 ["'[w]hile trial judges ordinarily enjoy broad discretion with respect to the admission and exclusion of evidence in ruling on motions in limine [citation], a court's discretion is limited by the legal principles applicable to the case'"].)

### 1.     *Strict Products Liability for Design Defects*

""""Products liability is the name currently given to the area of the law involving the liability of those who supply goods or products for the use of others to purchasers, users, and bystanders for losses of various kinds resulting from so-called defects in those products."' [Citations.] One may seek recovery in a products liability case on theories of both negligence and strict liability. [Citation.]" (*Johnson v. United States Steel Corporation* (2015) 240 Cal.App.4th 22, 30-31.) "Strict products liability was originally applied to manufacturers of consumer goods but has been extended to retailers, distributors, suppliers and other entities in the chain of distribution of a product that causes harm to a person or to property other than the product itself." (*Id.* at p. 31.) "The primary justification for creating the strict products liability doctrine was '"to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves."'" (*Bailey v. Safeway, Inc.* (2011) 199 Cal.App.4th 206, 213; see *Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 181-182 [purpose of imposing strict liability "is to ensure that the loss is borne not by injured consumers but by manufacturers, retailers and others in the chain of distribution who are better able to reduce the risks of injury and can equitably distribute the loss to the consuming public"].)

7

"The California Supreme Court has set out two alternative tests for identifying a design defect" in a strict products liability action:  the consumer expectations test and the risk-benefit test.  (*Johnson v. United States Steel Corporation*, *supra*, 240 Cal.App.4th at p. 32; see *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 567 (*Soule*); *Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1303 (*Chavez*).)  Under the consumer expectations test a product has a design defect if the product, when used in an intended or reasonably foreseeable manner, fails to perform as safely as an ordinary consumer would expect.  (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 479 (*Merrill*); *Chavez*, at p. 1303.)  "[O]rdinary users or consumers of a product may have reasonable, widely accepted minimum expectations about the circumstances under which it should perform safely.  Consumers govern their own conduct by these expectations, and products on the market should conform to them."  (*Soule*, at p. 566.)  Under the risk-benefit test a product has a design defect "if its design embodies 'excessive preventable danger.'"  (*Soule*, at p. 567, quoting *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 430 (*Barker*).)  A product's design embodies excessive preventable danger if the risks of danger inherent in the design outweigh the benefits of the design.  (*Soule*, at p. 567; *Barker*, at p. 430.)

To prove a design defect under the risk-benefit test, a plaintiff must present evidence sufficient to support a finding by the trier of fact that the design proximately caused the plaintiff's injuries.  If the plaintiff satisfies this burden, then the burden shifts to the defendant to prove that the product was not defective, i.e., that "the benefits of the challenged design outweigh the risk of danger inherent in such design."  (*Barker, supra*, 20 Cal.3d at p. 432; accord, *Merrill*, *supra*, 26 Cal.4th at p. 479; *Soule*, *supra*, 8 Cal.4th at p. 567; *Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1501; *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1310-1311.)  The trier of fact may consider, "'among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.'"  (*Merrill*, *supra*, 26 Cal.4th at p. 479, quoting *Barker*, *supra*, at

8

p. 431.)  The issue in this appeal is whether the trier of fact may consider evidence of industry custom and practice in the risk-benefit analysis.

a. Two Lines of Cases

The Kims rely on a series of Court of Appeal decisions holding or suggesting that evidence of industry custom and practice is always inadmissible in a strict products liability action to prove that a product was not (or, presumably, was) defective in design. The first, *Titus v. Bethlehem Steel Corp.* (1979) 91 Cal.App.3d 372, did not concern the admissibility of evidence, but the refusal to give a proper jury instruction.  In *Titus*, which involved an oil well pump that lacked a safety guard, the court held that the trial court erred by refusing to instruct the jury on the meaning of a "product defect."  The court reasoned that, absent such an instruction, the jury might have found that the pump was not defective because the industry custom and practice was to offer safety guards as optional equipment.  (*Id.* at pp. 376-379.)  Citing *Foglio v. Western Auto Supply* (1976) 56 Cal.App.3d 470, 477 (*Foglio*), the court stated that "custom and usage is not a defense to a cause of action based on strict liability," and that "on retrial the evidence on custom and usage as it pertains to the optional sale of the safeguards will be inadmissible . . . ." (*Titus*, at pp. 378, 381-382.) [4]

---

[4]     In *Foglio v. Western Auto Supply*, *supra*, 56 Cal.App.3d 470, the court held that the trial court erred by instructing the jury to consider evidence of industry custom and practice "'on the question whether or not the defendant exercised reasonable care in the design of the subject lawnmower.'" (*Id.* at p. 477.)  The court stated that the instruction was improper because it expressed a negligence standard, which was inapplicable in a strict products liability action.  (*Ibid.*)  The court did not discuss the issue whether a jury, properly instructed, could consider evidence of industry custom in a strict products liability action.

9

*Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, decided two years after *Titus*, was a strict products liability action involving a Ford Pinto hatchback that erupted in flames after it was hit from behind by another car. The trial court instructed the jury on the consumer expectations test, but refused to instruct on the risk-benefit test. (*Id.* at p. 801.) After the jury found for the plaintiffs, the defendant argued that the trial court had erred by rejecting the defendant manufacturer's proposed instruction on the risk-benefit test. The court stated that the consumer expectations and risk-benefit tests were alternative tests, and that the failure to instruct on the risk-benefit test did not prejudice the defendant. (*Id.* at pp. 771-772, 801-802.) The court also stated that the defendant's proposed instruction would have erroneously allowed the jury to consider the extent to which the Pinto's design conformed to the industry norm. The court stated: "In a strict products liability case, industry custom or usage is irrelevant to the issue of defect. [Citations.] The *Barker* court's enumeration of factors which may be considered under the risk-benefit test not only fails to mention custom or usage in the industry, the court otherwise makes clear by implication that they are inappropriate considerations. *Barker* contrasts the risk-benefit strict liability test with a negligent design action, stating that 'the jury's focus is properly directed to the condition of the product itself, and not to the reasonableness of the manufacturer's conduct. [Citations.] [¶] Thus, (the [*Barker*] court explains) the fact that the manufacturer took reasonable precautions in an attempt to design a safe product or otherwise acted as a reasonably prudent manufacturer would have under the circumstances, while perhaps absolving the manufacturer of liability under a negligence theory, will not preclude the imposition of liability under strict liability principles if, upon hindsight, the trier of fact concludes that the product's design is unsafe to consumers, users, or bystanders. [Citations.]' In *Foglio*, we held that an instruction permitting the jury in a strict products liability case to consider industry custom or practice in determining whether a design defect existed constituted error." (*Grimshaw, supra*, at p. 803.)

10

Next, in *McLaughlin v. Sikorsky Aircraft* (1983) 148 Cal.App.3d 203, the court stated that evidence the defendant had manufactured a helicopter according to military specifications was irrelevant to the plaintiff's design defect claim and that the admission of such evidence was error. (*Id.* at pp. 207-208.) The court in *McLaughlin* concluded that, in light of the admission of such evidence, the trial court prejudicially erred by failing to instruct the jury that the fact the defendant manufactured the helicopter according to military specifications was not a defense to the plaintiff's design defect claim. (*Id.* at p. 209.) The court also stated that the trial court properly admitted the defendant's evidence of the state of the art of helicopter design. The court distinguished admissible state-of-the-art evidence from inadmissible evidence of industry custom, stating, "In reaching this conclusion, we recognize the rule, not involved in this case, that evidence of industry custom and usage is irrelevant in a products liability case [citations]. The distinction between what are the capabilities of an industry and what practice is customary in an industry must be kept in mind." (*Id.* at p. 210.)

Finally, in *Buell-Wilson v. Ford Motor Co.* (2006) 141 Cal.App.4th 525 (*Buell-Wilson,*),[5] the court held that the trial court properly excluded evidence comparing a vehicle's rollover rate with those of other vehicles. (*Id.* at pp. 544-546.) The court in *Buell-Wilson* stated that evidence of industry custom or safety standards is irrelevant and inadmissible in strict products liability actions, and that "admission of such evidence is reversible error." (*Id.* at pp. 544-545.) The court explained that the issue in a strict products liability action is not whether the defendant exercised reasonable care, but

---

[5]     In *Ford Motor Co. v. Buell-Wilson* (2007) 550 U.S. 931, the United States Supreme Court vacated the judgment in *Buell-Wilson,* and remanded the matter to the Court of Appeal for further consideration in light of *Philip Morris USA v. Williams* (2007) 549 U.S. 346, which involved due process limits on the award of punitive damages. The California Supreme Court and Courts of Appeal have continued to cite *Buell-Wilson* for points of law not directly related to the punitive damages issue. (See, e.g., *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 796; *Mansur v. Ford Motor Co.* (2011) 197 Cal.App.4th 1365, 1380.)

whether the product failed to perform as safely as an ordinary consumer would expect. (*Id.* at p. 545.) The *Buell-Wilson* court also stated that the excluded evidence was not relevant to the risk-benefit analysis because it is not one of the factors enumerated in or suggested by the Supreme Court's opinion in *Barker*. (*Id.* at p. 545, citing *Grimshaw*, *supra*, 119 Cal.App.3d at p. 803.) The court in *Buell-Wilson* concluded that, by presenting evidence of rollover rates of comparable vehicles, the defendant manufacturer "improperly sought to show that it met industry standards or custom for rollovers." (*Buell-Wilson,* at p. 545.)

In contrast to these cases, the court in *Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403 (*Howard*) held that the trial court properly considered on summary judgment evidence that an allegedly defective bathtub complied with technical standards established by industry trade associations. (*Id.* at p. 413.) The court in *Howard* stated that the defendant manufacturer's "reliance on industry standards is a factor legitimately to be considered in the summary judgment proceedings." (*Id.* at p. 425.) The court stated that compliance with industry standards was not a complete defense under the risk-benefit test, nor was it "'irrelevant,' but instead properly should be taken into account through expert testimony as part of the design defect balancing process." (*Id.* at p. 426.) The court in *Howard* distinguished the language in the opinion in *Buell-Wilson*, *supra*, 141 Cal.App.4th at page 545, that "[a] manufacturer cannot defend a product liability action with evidence it met its industry's customs or standards on safety," by stating that this language only precluded a complete defense based on such evidence and did not preclude considering such evidence in risk-benefit balancing.[6] (*Howard*, at p. 426.)

_____

[6] The court in *Howard* also distinguished this language from the opinion in *Buell-Wilson* "as limited to a discussion of the consumer expectations standard." (*Howard*, *supra*, 203 Cal.App.4th at pp. 424-425.) The court in *Buell-Wilson*, however, did not so limit its discussion. The *Buell-Wilson* court stated not only that "the issue [in strict products liability actions] is whether the product fails to perform as the ordinary consumer would expect" (*Buell-Wilson*, *supra*, 141 Cal.App.4th at p. 545), but also that the excluded evidence was not relevant to the risk–benefit analysis because, "as

12

Thus, one line of authority following *Titus, supra,* 91 Cal.App.3d 372, and *Grimshaw*, *supra*, 119 Cal.App.3d 757, includes cases stating that evidence of industry custom and practice is irrelevant to the risk-benefit analysis and is inadmissible in a strict products liability design defect case involving the risk-benefit test. Another authority, *Howard*, *supra*, 203 Cal.App.4th 403, holds that compliance with technical safety standards established by an industry trade association is an appropriate consideration under the risk-benefit test and is admissible. It is true that the *Titus*/*Grimshaw* line of cases involved industry custom, while *Howard* involved trade association industry standards, but this distinction does not sufficiently explain the differing conclusions. After all, trade associations consist of manufacturers and other businesses whose conduct comprises the industry custom and practice. (See *Meyer v. Macmillan Pub. Co., Inc.* (S.D.N.Y. 1981) 526 F.Supp. 213, 217 ["[a] trade association is created by its members precisely for the purpose of representing them"].)

### b. A Middle Ground

We are not persuaded either line of authority is entirely correct. Instead, we conclude that evidence of industry custom and practice may be relevant and, in the discretion of the trial court, admissible in a strict products liability action, depending on the nature of the evidence and the purpose for which the party seeking its admission offers the evidence.

Industry custom may reflect legitimate, independent research and practical experience regarding the appropriate balance of product safety, cost, and functionality. (See 1 Owen & Davis on Products Liability (4th ed. 2014) Nature and Proof of Defectiveness, § 6:9, pp. 575-580; Comment, *Custom's Proper Role in Strict Product Liability Actions Based on Design Defect* (1990) 38 UCLA L.Rev. 439, 466-467.) The parties in a strict products liability action probably will dispute whether and to what

explained in *Grimshaw*, the *Barker* risk/benefit analysis does not allow admission of such evidence . . . ." (*Ibid.*)

13

extent industry custom actually reflects such considerations and whether it strikes the appropriate balance. But that does not make the evidence inadmissible. Evidence of compliance with industry custom may tend to show that a product is safe for its foreseeable uses, while evidence of noncompliance with industry custom may tend to show that a product is unsafe for its foreseeable uses. Thus, whether offered by the plaintiff or the defendant, such evidence may be relevant in a strict products liability action in determining whether a product embodies excessive preventable danger, which is the ultimate question under the risk-benefit test. (See *Pannu v. Land Rover North America, Inc.*, *supra*, 191 Cal.App.4th at pp. 1310-1311.) Evidence of industry custom also may be relevant to the feasibility of a safer alternative design, and to the consequences that would result from an alternative design, two of the *Barker* risk-benefit factors. (See Comment, *supra*, 38 UCLA L.Rev. at p. 465.) As the Kims acknowledge in their reply brief, "[o]ne might use other vehicles for purposes of showing alternative design or the feasibility of a given improvement."

Courts in other jurisdictions and commentators generally support the view that it is appropriate to consider compliance or noncompliance with industry custom in a risk-benefit analysis in strict products liability design defect cases. (See, e.g., *Carter v. Massey-Ferguson, Inc.* (5th Cir. 1983) 716 F.2d 344, 348 (*Carter*) (applying Texas law);[7] *Thibault v. Sears, Roebuck & Co.* (N.H. 1978) 395 A.2d 843, 850; 1 Owen & Davis,

---

[7] "Under Texas jurisprudence, evidence of industry custom is relevant to the proof of negligence by a manufacturer because the reasonableness of the manufacturer's conduct is at issue. [Citation.] In a strict liability case, however, the reasonableness of the manufacturer's conduct is not at issue; the manufacturer may be held liable even though he has exercised the utmost care. [Citation.] Thus, the argument is made that industry custom is not relevant in a strict liability case. [Citations.] This argument, however, goes too far: evidence need not be dispositive of an issue to be relevant. [Citation.] Industry custom is relevant in a strict liability case if it has any bearing on the condition of the product, which is the focus of a strict liability case." (*Carter*, *supra*, 716 F.2d at p. 348.)

*supra*, § 6:9, at pp. 578-580 [stating that the majority view is that evidence of applicable industry custom is admissible in strict products liability cases, and predicting that "[a]s an outmoded holdover from early, misguided efforts to distinguish strict liability from negligence, it may be expected that the few courts still clinging to the minority view will in time swing over to the more logical majority perspective"]; Rest.3d Torts, Products Liability, § 2, com. d, p. 20 ["[i]ndustry practice may also be relevant to whether the omission of an alternative design rendered the product not reasonably safe"]; but see *Lewis v. Coffing Hoist Division, Duff-Norton Co., Inc.* (Pa. 1987) 528 A.2d 590, 594 (*Lewis*) [evidence of industry custom is irrelevant and likely to confuse the issues under Pennsylvania's defect test].) Other authorities hold, for similar reasons, that it is appropriate to consider compliance or noncompliance with industry technical standards established by a nongovernmental organization. (See, e.g., *Hohlenkamp v. Rheem Mfg. Co.* (Ariz. Ct. App. 1982) 655 P.2d 32, 36; *Union Supply Co. v. Pust* (Colo. 1978) 583 P.2d 276, 286-287; *Mikolajczyk v. Ford Motor Co.* (Ill. 2008) 901 N.E.2d 329, 335; 1 Owen & Davis, *supra*, § 6:9, pp. 578-580; Vetri, *Order Out of Chaos: Products Liability Design-Defect Law* (2009) 43 U. Rich. L.Rev. 1373, 1454-1455.)

The view that evidence of industry custom and practice is always inadmissible in strict products liability actions derives in large part from the increasingly outmoded theory that strict products liability is so entirely different from negligence that it should not share any features with negligence doctrines. (See *Buell-Wilson*, *supra*, 141 Cal.App.4th at p. 545; *Grimshaw*, *supra*, 119 Cal.App.3d at p. 803; see also *Lewis*, *supra*, 528 A.2d at p. 594 [because industry custom is related "to the reasonableness of the [manufacturer's] conduct," such evidence "would have improperly brought into the case concepts of negligence law"].) For example, in *Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121 (*Cronin*), the Supreme Court held that a plaintiff in a strict products liability action need not prove that a defective product was "unreasonably dangerous" to establish a design defect. (*Id.* at pp. 134-135.) The Supreme Court stated that such a proof requirement "rings of negligence" (*id.* at p. 132), and that imposing such a burden on the

15

plaintiff would undermine "the very purpose of our pioneering efforts in this field . . . to relieve the plaintiff from problems of proof inherent in pursuing negligence" (*id.* at p. 133).

More recently, however, the Supreme Court has rejected the argument that rules derived from negligence law are incompatible with strict products liability, and has incorporated negligence principles into strict products liability doctrine. In *Barker*, *supra*, 20 Cal.3d 413, the Supreme Court held that the risk-benefit test is an appropriate means to determine the existence of a design defect as an alternative to the consumer expectations test. (*Id.* at p. 435.) The Supreme Court acknowledged that risk-benefit balancing in some ways may resemble a negligence inquiry (*id.* at p. 434), and stated that "most of the evidentiary matters which may be relevant to the determination of the adequacy of a product's design under the 'risk-benefit' standard – e.g., the feasibility and cost of alternate designs – are similar to issues typically presented in a negligent design case." (*Id.* at p. 431.) The court stated, however, that the two inquiries are not identical, because risk-benefit balancing focuses on the product's condition rather than the reasonableness of the defendant's conduct. (*Id.* at p. 434.) By shifting the burden of proof to the defendant, the risk-benefit test reduces the plaintiff's burden consistent with strict liability principles. (*Id.* at p. 433.) The Supreme Court therefore rejected the argument that risk-benefit balancing was inappropriate in a strict products liability action. (*Ibid.*)

The California Supreme Court has continued to incorporate negligence concepts into strict products liability doctrine. In *Daly v. General Motors Corp.* (1978) 20 Cal.3d 725 the Supreme Court held that principles of comparative negligence apply to strict products liability cases. (*Id.* at p. 742.) The court stated, "While fully recognizing the theoretical and semantic distinctions between the twin principles of strict products liability and traditional negligence, we think they can be blended or accommodated." (*Id.* at p. 734.) In *Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987 (*Anderson*) the Supreme Court held that evidence of the state of the art at the time of the product's manufacture or distribution is admissible in strict products liability failure-to-

16

warn cases. The court rejected the argument that the admission of such evidence would "improperly infuse negligence concepts into strict liability cases," stating that "the claim that a particular component 'rings of' or 'sounds in' negligence has not precluded its acceptance in the context of strict liability."[8] (*Id.* at p. 1001.) And in *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56 the Supreme Court held that the sophisticated user defense applies in strict products liability failure-to-warn cases. (*Id.* at p. 74.) The court stated, "[W]e have repeatedly held that strict products liability law in California may incorporate negligence concepts without undermining the principles fundamental to a strict liability claim. [Citations.]" (*Id.* at p. 73; see *Merrill*, *supra*, 26 Cal.4th at p. 480 ["over the years, we have incorporated a number of negligence principles into the strict liability doctrine, including *Barker*'s risk/benefit test"].)

Following the Supreme Court's direction in this area, we depart from those cases stating that evidence of industry custom is irrelevant to the risk-benefit analysis and always inadmissible in a strict products liability case involving the risk-benefit test. The fact that such evidence may also be relevant to the standard of care in a negligence action does not justify its categorical exclusion in a strict products liability case. Nor do we follow the suggestion in *Howard*, *supra*, 203 Cal.App.4th 403, that evidence of industry custom is always admissible in a strict products liability case. Instead, we conclude that evidence of industry custom may be relevant to the risk-benefit analysis and admissible in a strict products liability action, depending on the nature of the evidence and the purpose for which it is offered. Either side may seek to introduce evidence of industry custom and practice, and the trial court has discretion to exclude it if it is not relevant to the issues in the case, if under Evidence Code section 352 its probative value is substantially outweighed by the risk of undue prejudice or confusion of the issues, or if

---

[8] The Supreme Court in *Anderson* also noted that on the same day as the *Cronin* decision the Supreme Court decided *Luque v. McLean* (1972) 8 Cal.3d 136, 145, which held that a plaintiff's assumption of risk is a defense to strict products liability. (*Anderson*, *supra*, 53 Cal.3d at p. 1001.)

the evidence is otherwise inadmissible.  (Cf. *Pannu v. Land Rover North America, Inc.*, *supra*, 191 Cal.App.4th at pp. 1320-1321 [trial court has discretion under Evidence Code section 352 to exclude evidence of compliance with FMVSS].)

c.      Some Examples from This Case

Under our approach, evidence of industry custom and practice may be relevant to several of the factors in the risk-benefit analysis.  (See *Merrill*, *supra*, 26 Cal.4th at p. 479; *Barker*, *supra*, 20 Cal.3d at p. 431.)  For example, evidence that a manufacturer's competitors tried to produce a safer alternative design for a product, but the alternative design malfunctioned or functioned only at an unsustainable cost, would be relevant to the mechanical feasibility factor, as would evidence that such a design by a competitor was functional and cost-effective.  Indeed, in this case, counsel for the Kims conceded at oral argument that evidence, if there were any, that other truck manufacturers included ESC on their pickup trucks would be admissible, as relevant to the feasibility factor of the risk-benefit analysis.  Similarly, evidence that a competitor's alternative design made the product less efficient or desirable to the consumer would be relevant to the adverse consequences factor, as would contrary evidence.  Even the aesthetics of a competitor's alternative design might be relevant.  (See *Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1130-1131 ["a jury properly may consider aesthetics in balancing the benefits of a challenged design against the risk of danger inherent in the design"].)

Other evidence of industry custom and practice, however, may not be admissible.  Toyota's brief includes some good examples.  Toyota argues that evidence "competing trucks did not offer ESC" was relevant in this case because it "demonstrated that making ESC standard would have put the Tundra at a competitive disadvantage" and "would have made the Tundra less marketable and less attractive to consumers," which is relevant to the "adverse consequence[s] to the product and consumer" factor of the risk-benefit analysis.  That is not what this factor means.  Putting the product at a "competitive disadvantage" is an adverse consequence to the manufacturer, not to the

consumer or the product. Toyota also argues that evidence that the pickup trucks of its competitors did not have ESC was relevant to the "gravity posed" and "likelihood the danger would occur" risk-benefit factors because "[i]f the Tundra was defective because it lacked ESC, then *every other pickup* in 2005 was defective," which "made [the Kims'] claims of danger less credible." This is actually a prime example of when industry custom and practice would *not* be admissible. The fact that all of the manufacturers in an industry make the product the same way is not relevant because it does not tend to prove the product is not dangerous: All manufacturers may be producing an unsafe product.

On the other hand, Toyota correctly argues that evidence about pickup trucks manufactured by its competitors was relevant to rebut some of the Kims' arguments. For example, the Kims argued that pickup trucks are similar to SUVs, SUVs had ESC, and Toyota was going to make ESC standard on its trucks until it learned its competitors were not going to do so. Counsel for the Kims argued at the hearing on motion in limine No. 4 that "the only [Toyota] vehicles that didn't have ESC on them were [its] trucks and, of course, SUVs are considered to be like trucks . . . and they all had ESC as standard since 2001," but Toyota decided not to put ESC on trucks, even though Toyota initially intended to do so, "because their competitors didn't do it." Counsel for the Kims also told the jury in opening statement that the evidence would show that ESC was standard on Toyota's SUVs, Toyota understood that SUVs and pickup trucks have similar "controllability problems," Toyota was going to make ESC standard on its trucks by 2005 because Ford was going to do so, but Toyota changed its mind and decided to make ESC optional when it learned that Ford was not going to make it standard. Thus, evidence regarding the decision by at least one of Toyota's competitors whether to implement ESC in pickup trucks would have been admissible to rebut the Kims' claim of why Toyota had not included ESC on its trucks as standard equipment.

### 2. The Admissibility of the Evidence in This Case

The principal issue in this appeal is whether the trial court abused its discretion in denying the Kims' motion in limine No. 4, which sought to exclude all evidence

19

comparing the Toyota Tundra to its competitors in the industry based on the line of authority stating that evidence of industry custom and practice is always inadmissible. Because we conclude the per se rule of inadmissibility of such evidence is not correct, the trial court properly denied the motion.

The Kims argue that the trial court "not only denied" motion in limine No. 4, but also "allowed Toyota to bring in a raft of evidence to the effect that other manufacture[r]s were not offering ESC on full size pick-ups and other vehicles." The Kims cite three portions of the record where they suggest the trial court improperly allowed the jury to hear testimony about Toyota's competitors. First, they cite to a series of questions counsel for Toyota asked Papelis, arguing that Toyota "was allowed to examine experts about the failure of other manufacturers to offer ESC on their trucks and on the FMVSS."[9] The Kims' argument, however, is not based on a fair representation of the record. Their opening brief points to five questions counsel for Toyota asked Papelis on cross-examination about other truck manufacturers or the FMVSS:

(1) "Q: And with respect to peer vehicles and peer-vehicle manufacturers, are you aware of any other pickup truck in the '05 years as far as domestic producers that had ESC technology in pickup trucks?"

(2) "Q: And do you have any working knowledge or understanding of the [FMVSS]?"

(3) "Q: And you don't have any quarrel with the fact that the '05 [T]undra complied with and exceeded all requirements in the FMVSS?"

(4) "Q: And do you know anything about when the [FMVSS] first addressed ESC?"

(5) "Q: Would it surprise you to know that Toyota was one of the earlier developers of ESC technology also known in Toyota as VSC?"

---

[9] The Kims do not appeal the admissibility of any evidence "of compliance with FMVSS standards." They concede that "an industry technical standard (like government standards) may be relevant in assessing the suitability of a given design."

20

The Kims, however, do not provide Papelis's answers to these questions, instead using ellipses to skip over the answers in order to quote the next question. The transcript shows that these were Papelis's answers:

(1)     "Whether I know that, that doesn't mean anything because I may be ignorant in terms of the motives and what's available. Again, it's not my expertise. I don't remember a lot of facts about every car, things like that. We don't buy cars frequently. So there may be, there may not, but whether I know of it or not, I don't think is – means much really."

(2)     "I have some exposure to it."

(3)     "That's not my purview, so I don't have an opinion either/or."

(4)     "My familiarity with ESC is on a technical basis in terms of when engineers and researchers, auto companies present results. The regulatory aspect of it is not my purview."

(5)     "Few things surprise me anymore, but, no, that particular fact doesn't surprise me either."

The record thus reveals that counsel for Toyota's questioning of Papelis did not elicit any testimony about Toyota's competitors or industry custom and practice because there were no substantive answers to counsel's questions. Counsel's questions are not evidence. (See *Cuenca v. Safeway San Francisco Employees Federal Credit Union* (1986) 180 Cal.App.3d 985, 998.) And the trial court instructed the jury on this point pursuant to CACI No. 5002, "The attorneys' questions are not evidence. Only the witnesses' answers are evidence. You should not think that something is true just because an attorney's question suggested that it was true." In any event, the Kims did not object to any of these questions.

Next, the Kims cite Lobenstein's testimony in response to questioning by counsel for the Kims about other truck manufacturers:

"Q:     Was there any surprise to you that the take rate on VSC was so low in view of your knowledge of the efficacy of VSC, let alone the public's knowledge?

"A:     No other full-size pickup was offering VSC at the time, so --

21

"Q:     I know that's your mantra.  You want to talk about competitors.  I'll ask you about that in just a second.

"[Counsel for Toyota:]     Objection.

"The Court:   The objection is sustained -- you may answer.

"A:     No one else had VSC at the time in a full-size truck, so we didn't have any expectations.  We made the option available to consumers and we wanted to see what the demand was.  So I don't believe that I was surprised at the take rate at the time.

"Q:     Okay.  So you are saying that because Ford and Dodge weren't offering VSC, you didn't want to lose your competitive advantage by incurring the extra cost for VSC even though your engineers were telling you to do so?

"A:     We were trying to make a vehicle, produce a vehicle that met the customer's needs based on price, based on future availability, and at the time we felt like optional VSC was the best decision."

"Q:     Well, are you saying . . . you omitted what [Toyota] is telling you, the safety features that they thought to be standard, because your competitors were likewise omitting it?

"A:     We studied what our competitors had and we studied what our customers wanted, and we made the feature available as an option so if somebody wanted it, they could have it."

These questions, to which counsel for the Kims obviously did not object because he was asking them, were proper and sought information that was relevant to the Kims' products liability claim.  Counsel for the Kims first asked if Lobenstein had been surprised by the low number of customers who had decided to buy VSC as an option (i.e., the "take rate"), and Lobenstein answered that he was not surprised because, given the absence of VSC in full-size trucks in the market at the time, he had no expectations about the number of customers who would select it as an option.  There was nothing improper about this line of inquiry or the witness's answers, and, even if there were, counsel for the Kims did not move to strike any of the answers or request a limiting instruction.  The other questions by counsel for the Kims were designed to show that Toyota was making

22

VSC optional on its trucks, rather than standard as the engineers had suggested, because Toyota's competitors were not making VSC standard. This was also a proper line of questioning designed to show the jury that Toyota was ignoring the advice of its engineers and putting profit over safety, and illustrates how the plaintiff in a products liability case can properly introduce evidence of industry custom or practice.

Finally, the Kims cite Lobenstein's testimony during questioning by counsel for Toyota about industry custom or practice:

"Q:     Were any other trucks, pickup trucks, available on the market in 2005 with standard VSC?

"A:     No. There were none.

"Q:     And to your knowledge was the Tundra the first that had it as an option?

"A:     Yes. Tundra was the first full-size truck to have VSC as an option.

"Q:     Now . . . that's eight, nine years ago --

"A:     Yes.

"Q:     -- is this discussion was being had?

"A:      Yes.

"Q:     Now, if we come to today, are there continuing to be new technologies, new safety technologies that are being implemented and phased into Toyota and other vehicles?

"A:     Sure. Right now there is technology like backup cameras, lane departure warnings, lane keep assist, which helps the driver stay in their lane, pre-collision warning. There [are] lots of new safety features that are slowing working . . . their way into the market."

Lobenstein then testified that these safety features included optional equipment that had not yet become standard, such as backup cameras, active cruise control, pre-collision sensors, and lane departure warnings. Lobenstein also said that adding one of these developing safety features raised the price of the vehicle. For example, a lane departure warning could price a $15,000 car like the Toyota Corolla "out of the market, and customers wouldn't purchase [the] car."

23

Counsel for the Kims did not object to these questions, and to the extent counsel objected to other questions in this general area of questioning, the Kims do not argue that any particular evidentiary ruling was an abuse of discretion. Counsel for the Kims had previously acknowledged that the admissibility of this evidence would depend on the purpose for which Toyota offered it.[10] At the hearing on motion in limine No. 4, counsel for the Kims stated, "I guess what I'm asking for is that if and when this evidence is received, it be for a limiting instruction as to a reason why it's being offered is to explain why they did or didn't do what they did under the risk benefit doctrine." In ruling on the motion, the court stated, "Counsel, you are certainly welcome to prepare a limiting instruction that you'd like and I'll certainly review it and we'll litigate that instruction at the appropriate time," and counsel for the Kims stated, "Understood." Yet, when Lobenstein testified about the availability of ESC on other pickup trucks in the market, the Kims did not object, ask for the reason Toyota was offering the evidence, or request or propose a limiting instruction. In the absence of a specific objection or request for a limiting instruction, we cannot conclude that the court erred by admitting Lobenstein's testimony.

Because the Kims did not object at trial to any specific questions asked by counsel for Toyota that may have called for testimony about the custom and practice in the automotive industry, nor did they propose a limiting instruction as they said they would and as the court said it would consider, the trial court did not err by admitting the

10      For example, if Toyota was trying to prove that the 2005 Tundra was not defective because no other pickup trucks in the industry had ESC standard and Toyota was the first manufacturer to offer ESC as an option, the evidence might not have been relevant. In that circumstance, counsel for Toyota might have had to rephrase the question, or the Kims may have been entitled to a limiting instruction. Similarly, as discussed, the testimony suggesting that adding a safety feature to a vehicle might increase the cost and negatively affect sales also might be inadmissible. Conversely, the testimony about how new safety technologies evolve and are phased in to vehicles in general, first as an option and then as standard equipment, is relevant to the risk-benefit analysis, and the two questions by counsel for Toyota about the state of the ESC in the pickup market in 2005 may have been valid introductory questions to that line of inquiry.

evidence about Toyota's competitors. The court did not abuse its discretion in denying motion in limine No. 4 or admitting the testimony by Papelis or Lobenstein.

> B. *The Trial Court Properly Refused the Kims' Proposed Instructions on Federal Motor Vehicle Safety Standards and Industry Custom*

The Kims argue that the trial court erred by refusing their proposed instructions on FMVSS and industry custom. "'A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him [or her] which is supported by substantial evidence.' [Citation.] A court may refuse a proposed instruction that incorrectly states the law or is argumentative, misleading, or incomplete. [Citations.] A court also may refuse an instruction requested by a party when the legal point is adequately covered by other instructions given. [Citation.]" (*Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475.) We independently review the trial court's refusal to give a proposed instruction, viewing the evidence in the light most favorable to the appellant. (*Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 743.)

The Kims' proposed instruction No. 19 stated, in relevant part, "it is no defense that the design of the Tundra complied with Federal Motor Vehicle Safety Standards, or that the design met the standards of the motor vehicle industry at the time the Tundra was produced, or that Toyota's competitors sold vehicles that were no safer than the Tundra, or had the same design defects, or lacked the same safety equipment." The Kims do not argue that compliance with FMVSS was an improper consideration under the risk-benefit test. Instead, they argue that their proposed instruction No. 19 would have ensured that the jury did not defer to FMVSS or industry custom rather than apply the risk-benefit test.

The trial court properly refused proposed instruction No. 19 as misleading, argumentative, and incomplete. It was misleading because the jury might have understood that the language "it is no defense" in this context meant that the referenced government and industry standards were irrelevant to the existence of a design defect, when, as discussed, such standards in fact may be relevant. (See *Veronese v. Lucasfilm*

25

*Ltd.* (2012) 212 Cal.App.4th 1, 24-26 [a proposed instruction that a particular concern is "'not a defense'" was potentially misleading because the concern was not necessarily irrelevant].)  The proposed instruction was argumentative because the reference to "the same design defects" suggested that the Tundra was defective.  (See *Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp., U.S.A.* (2013) 221 Cal.App.4th 867, 882 [the trial court properly refused a proposed instruction as argumentative]; *Santillan v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 725-726 [same].)  A more balanced and complete instruction would have stated that the jury could consider Toyota's compliance or noncompliance with FMVSS and industry custom in applying the risk-benefit test, but that such compliance or noncompliance is not dispositive.  (See *O'Neill v. Novartis Consumer Health, Inc.* (2007) 147 Cal.App.4th 1388, 1392-1393 [trial court properly refused a proposed instruction stating that compliance with Food and Drug Administration (FDA) regulations was "not a defense" to a strict products liability design defense claim, and instead properly instructed the jury that "'FDA action or inaction, though not dispositive, may be considered'"].)

The Kims also challenge the refusal of their proposed instructions Nos. 20, 21, and 22.  The Kims, however, fail to discuss the language of those instructions in their opening brief or demonstrate that these instructions were proper.  (See *Blevin v. Coastal Surgical Institute* (2015) 232 Cal.App.4th 1321, 1330 [appellant has burden to show that refusal to give an instruction was error].)

C.   *The Trial Court Did Not Abuse Its Discretion by Excluding Certain Exhibits*

The Kims argue that the trial court erred by excluding three documents, totaling 50 pages, which, among other things, included references and discussions to the effectiveness of VSC and recommendations that Toyota make VSC standard on Toyota vehicles.  "Trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion."  (*Pannu v. Land Rover North America, Inc.*, *supra*, 191 Cal.App.4th at p. 1317; see *People v. Goldsmith* (2014) 59

26

Cal.4th 258, 266 (*Goldsmith*); *Zhou v. Unisource Worldwide, Inc.* (2007) 157 Cal.App.4th 1471, 1476.)

The documents the trial court excluded, Exhibits 44, 93, and 94, appear to be copies of PowerPoint slides. Exhibits 44 and 93 are both entitled, "The strategy to Dynamic Rollover NCAP," and state under the title, "Chassis System Development Div." Exhibit 94 is primarily in Japanese, but it includes some pages in English. The three documents include charts and graphs purportedly depicting the incidence of injuries and deaths in collisions with and without VSC and the incidence of rollover accidents. They also show the results of some rollover tests on Toyota cars, trucks, and minivans. Both Exhibit 44 and Exhibit 93 state, "VSC is indispensible for Pickups." Exhibit 94 states that VSC could reduce loss of control in single-vehicle accidents and prevent some rollovers, and that Toyota should provide VSC as standard equipment in all Toyota pickups.

The trial court initially sustained Toyota's objection based on lack of authentication, but then asked the parties to brief the issue of the documents' admissibility. Toyota argued that the Kims had not presented any evidence identifying the authors or recipients of the documents or any evidence concerning the documents' creation or use. Toyota argued that there was no evidence Toyota employees or agents had authorized the documents. Toyota also argued that the documents were inadmissible hearsay and that the hearsay exceptions for statements authorized by a party (Evid. Code, § 1222) and business records (*id.*, § 1271) did not apply. Finally, Toyota argued that the documents were inadmissible under Evidence Code section 352 because the danger of undue prejudice substantially outweighed their probative value.

The Kims argued that there were sufficient facts for the jury to find that Toyota had created the documents because of the contents of the documents, and because Toyota had produced the documents in discovery and had sought a protective order designating the documents as confidential. The Kims also argued that the hearsay exceptions for prior statements by a party to the action (Evid. Code, § 1220) and statements authorized by a party (*id.*, § 1222) applied. The Kims also argued that, even if the documents were

27

not admissible to prove the truth of the statements about VSC, they were admissible to show Toyota's awareness of the danger of driving vehicles without VSC and of recommendations to make VSC standard equipment.

At a hearing outside the presence of the jury, the trial court stated about the three PowerPoint documents, "I'm very concerned about the stats they use, et cetera. I have no idea whether they're true or not, and it would be unfair to have the jury look at that and be able to view that and consider that as being true. . . . [A]s far as the underlying data that they point to, there is a real problem with that. There is no way to know whether that's accurate, whether it's reliable, what is the source of it. That's a huge problem with that." The court then overruled Toyota's authentication objection, but sustained the objections based on Evidence Code section 352 and hearsay. The court stated, "there is a lot of hearsay in there," and, "I'm excluding it under the basis of 352 and the *O'Neill* case that there is an insufficient basis to establish who said it and that the person was authorized to make that statement on behalf of Toyota."[11]

On appeal the Kims argue that statements in the documents were not hearsay, that hearsay exceptions applied, and that there was no substantial danger of undue prejudice or other basis for excluding the documents under Evidence Code section 352. They also renew their argument that they provided sufficient evidence to authenticate the documents.

The three documents included numerous charts, graphs, statistics, and acronyms that, without explanation, would have been confusing to the jury. For example, Exhibit 44 included several charts labeled "Dynamic Rollover NCAP tests Results," each with columns headed "SSF–NCAP," "Dynamic NCAP Result," as well as other columns. The information in the documents included graphics, pie charts, stars, and bar graphs of different colors, the significance of which is not readily apparent, and a chart graphing

---

[11] Presumably, the court was referring to *O'Neill v. Novartis Consumer Health, Inc.*, *supra*, 147 Cal.App.4th 1388, which involved an individual's authority to make a statement on behalf of a company under Evidence Code section 1222. (See *id.* at pp. 1402-1403.)

center of gravity height against millimeters of tread that looks like a disjointed map of the solar system. Some of the information in the documents concerned rollovers rather than the kind of single vehicle accident that occurred here. The documents also included information about whether Toyota's competitors had provided ESC in their sport utility vehicles either as standard or optional equipment. No one at trial was able to explain what these documents were or where they came from. Counsel for the Kims did not call any witnesses who could describe what the documents were, explain the meaning of the charts, graphs, abbreviations, and acronyms, or provide some context for the documents, nor did the Kims offer redacted versions of these documents that excluded the statistical and other confusing information. Lobenstein, who was testifying in the Kims' case-in-chief when they tried to introduce the documents into evidence, was not familiar with and did not have any knowledge about any of the documents.

The risk of confusion and undue prejudice from placing before the jury complicated PowerPoint slides with undefined technical jargon and unexplained graphics was great. And the probative value was slight because there was other evidence of what the Kims wanted to use the documents to show: that Toyota engineers had recommended VSC for its pickup trucks. For example, Lobenstein testified repeatedly (at least five times) in response to questioning by counsel for the Kims that Toyota engineers had recommended making VSC standard equipment for the Tundra, and Toyota did not dispute this testimony. In addition, Papelis testified as to many of the statistics regarding the effectiveness of ESC that were contained in the excluded PowerPoint slides, and Toyota conceded at trial that those statistics were correct.[12]

---

[12]     Counsel for Toyota stated during closing argument: "One half of the opinions rendered by Dr. Papelis are valid, pretty valid stuff. The simulator studies that he did and the paper that he wrote concluded that VSC does prevent and can reduce the number of rollover and some loss-of-control accidents. I agree. Toyota agrees. Their study concluded, I believe, a 30-to-35-percent reduction. . . . That data seems to be shaking out as fairly accurate. I'm not going to tell you to disregard that."

A trial court may exclude evidence if the danger of undue prejudice, confusing the issues, or misleading the jury substantially outweighs its probative value. (Evid. Code, § 352.) A trial court has broad discretion to exclude evidence under Evidence Code section 352. (*Colombo v. BRP US Inc.* (2014) 230 Cal.App.4th 1442, 1483.) The trial court was amply justified, and did not abuse its discretion, in concluding that the danger of confusing the issues and misleading the jury regarding the source and significance of the documents, and the danger of undue prejudice caused by the admission of evidence that no one could explain to the jury, substantially outweighed the probative value of the exhibits.

In addition, as Toyota argued, authentication was a problem. (See *Ceja v. Department of Transportation* (2011) 201 Cal.App.4th 1475, 1483 ["if the exclusion of evidence is proper on any theory, the exclusion must be sustained"]; *Philip Chang & Sons Associates v. La Casa Novato* (1986) 177 Cal.App.3d 159, 173 ["[i]f the exclusion is proper upon any theory of law applicable to the . . . case, the exclusion must be sustained regardless of the particular considerations which may have motivated the trial court to its decision"]; see also *Davey v. Southern Pac. Co.* (1897) 116 Cal. 325, 330 ["[a]n objection to evidence is but a reason offered for its exclusion," and if the objection is "sustained, and there appears any other reason for which the evidence should have been excluded, the ruling must stand"].) "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code*,* § 1400.) A writing's proponent has the burden of producing evidence of its authenticity, and the writing is admissible only if the trial court finds that there is sufficient evidence to sustain a finding of authenticity. (*Id.*, § 403, subd. (a) & (a)(3).) "As explained by the California Law Revision Commission's comment to section 1400, '[b]efore any tangible object may be admitted into evidence, the party seeking to introduce the object must make a preliminary showing that the object is in some way relevant to the issues to be decided in the action. When the object sought to be introduced is a writing, this preliminary showing of relevancy usually entails some

proof that the writing is authentic—i.e., that the writing was made or signed by its purported maker. Hence, this showing is normally referred to as "authentication" of the writing.'" (*Goldsmith*, *supra*, 59 Cal.4th at pp. 266-267.) "The means of authenticating a writing are not limited to those specified in the Evidence Code. [Citations.] For example, a writing can be authenticated by circumstantial evidence and by its contents." (*People v. Skiles* (2011) 51 Cal.4th 1178, 1187.)

The Kims offered no evidence to authenticate the three documents other than the documents. No one testified about who had authored the documents, who had received them, or how they were used. Although the Kims argued that Toyota had produced the documents in discovery and sought to protect them as confidential, they did not present any evidence at trial of these purported facts. More important, the fact that a party produces a document in discovery does not authenticate the document. And contrary to the Kims' assertion, Toyota did not admit the documents' authenticity (see Evid. Code, § 1414, subd. (a)). The documents did not have a Toyota logo, and they did not identify any Toyota employee as their author.[13] The documents do refer to Toyota vehicles, VSC's potential safety benefits, and potential benefits to Toyota's reputation for safety, but those references alone do not support a finding that Toyota or its authorized agents authored the documents.

### D. *The Trial Court Did Not Err in Refusing To Instruct the Jury on the Consumer Expectations Test*

The Kims argue that the trial court erred by refusing to instruct the jury on the consumer expectations test. The consumer expectations test, however, did not apply to this case.

---

[13]    Exhibits 44 and 93 include the words, "Chassis System Development Div.," but the Kims do not cite to any evidence identifying that group as a division of Toyota.

"[W]hether a plaintiff may proceed under the consumer expectation test or whether design defect must be assessed solely under the risk-benefit test is dependent upon the particular facts in each case." (*Chavez*, *supra,* 207 Cal.App.4th at p. 1310.) The consumer expectations test applies "where the minimum safety of a product is within the common knowledge of lay jurors" who can form reasonable expectations about the product's safety in the context of a particular accident. (*Soule*, *supra*, 8 Cal.4th at pp. 567-569; *Chavez*, at p. 1310.) The test is inapplicable to a complex product if ordinary consumers would not understand how safe the manufacturer can make the product against foreseeable hazards. (*Soule*, *supra*, at pp. 566-567.) "Because '"[i]n many situations . . . the consumer would have no idea how safe[ly] the product could be made,"' the consumer expectation test is 'reserved for those cases in which the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions, and is thus defective regardless of expert opinion about the merits of the design.' [Citation.] In those cases where an injury has been caused 'in a way that does not engage its ordinary consumers' reasonable minimum assumptions about safe performance' [citation], and the plaintiff's theory of defect seeks to examine the behavior of 'obscure components . . . under . . . complex circumstances' outside the ordinary experience of the consumer, the consumer expectation test is inapplicable; and defect may only be proved by resort to the risk-benefit analysis." (*Chavez,* at p. 1310, italics omitted.)

The Kims' theory at trial was that their Tundra was defective because it lacked ESC, an obscure and complex electronic component. They did not rely on the understanding and expectation of an ordinary consumer concerning the vehicle's safety in seeking to establish a defect. Instead, by relying on expert testimony to explain what ESC is and how it functions, the Kims implicitly acknowledged that the ordinary consumer was unfamiliar with ESC, did not understand its functioning or safety implications, and would have no reasonable expectation about the impact of ESC or its absence on a vehicle's safety. (See *Soule*, *supra*, 8 Cal.4th at p. 567 ["the ordinary consumer of an automobile simply has 'no idea' how it should perform in all foreseeable

32

situations, or how safe it should be made against all foreseeable hazards"].) Therefore, the consumer expectations test was inapplicable, and the trial court properly refused to instruct the jury on the consumer expectations test. (See *Morson v. Superior Court* (2001) 90 Cal.App.4th 775, 795 [the trial court properly refused to instruct on the consumer expectations test]; *Pruitt v. General Motors Corp.* (1999) 72 Cal.App.4th 1480, 1483-1484 [same].)

E.   *The Trial Court Did Not Abuse Its Discretion in Limiting Counsel for the Kims' Rebuttal Argument*

The Kims argue that the trial court abused its discretion by cutting off their rebuttal argument with only a three-minute warning. The Kims contend that the trial court's actions left them with insufficient time to rebut Toyota's closing argument that the jurors should "focus on the term 'defect' in the verdict form without regard to the definition of 'defect' in CACI 1204, and the defendant's burden . . . to demonstrate that Tundra design, in the absence of ESC, did not incorporate excessive preventable danger." The Kims also argue that they did not have enough time to rebut Toyota's arguments regarding the significance of the evidence that Toyota's competitors did not offer ESC in pickup trucks and the sequence of events preceding the accident.

Counsel for the Kims made his initial closing argument, which the trial court later stated lasted "about two hours," on Friday, November 30, 2012. Counsel for Toyota began his closing argument that afternoon and completed it in the morning on Monday, December 3, 2012. The trial court then stated, at approximately 10:15 a.m., "At this time we'll take the morning recess unless you want to go until 11 o'clock?" Counsel for the Kims responded, "Yeah. Let me go until 11 o'clock and we'll have a recess." The court stated, "Are we okay until 11 o'clock? Okay." Counsel for the Kims proceeded to give his rebuttal argument until the court told counsel for the Kims a few minutes before 11:00 a.m., "you have three minutes left." Counsel requested clarification and stated that he must have misunderstood the court's prior statement and he could not complete his

33

argument in that amount of time.  The court told counsel to do his best, and counsel concluded his argument.

The trial court later denied the Kims' request to reopen argument.  The court stated that it had intended to skip the morning break and end argument at 11:00 a.m., and stated that the court did not understand how counsel for the Kims could have believed otherwise.  When the Kims subsequently challenged the time limitation on their rebuttal argument in their new trial motion,  the court acknowledged at that time that the reporter's transcript reflected that the court had not made clear its intention to end argument at 11:00 a.m.  The court stated, however, that the Kims had unlimited time for their closing argument and 40 minutes for their rebuttal argument, and that there was no miscarriage of justice.  The court denied the new trial motion.

"A trial court has the inherent authority and responsibility to fairly and efficiently administer the judicial proceedings before it.  [Citations.]  This authority includes the power to supervise proceedings for the orderly conduct of the court's business and to guard against inept procedures and unnecessary indulgences that tend to delay the conduct of its proceedings." (*California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 22.)  A trial court has discretion in civil cases to impose reasonable limits on closing arguments.  (*Bates v. Newman* (1953) 121 Cal.App.2d 800, 809-810; *Rosenfield v. Vosper* (1948) 86 Cal.App.2d 687, 695; *Ackerman v. Griggs* (1930) 109 Cal.App. 365, 369; see also Code Civ. Proc., § 128, subd. (a)(3) [every court has the power "[t]o provide for the orderly conduct of proceedings before it"].)  We review the trial court's trial time management rulings for abuse of discretion.  (*California Crane School*, at pp. 17, 24.)

The record suggests that counsel for the Kims may have been sincere in his expression of surprise when shortly before 11:00 a.m. the trial court allowed him only three minutes to complete his closing argument.  Most trial lawyers and trial judges, however, would understand a statement by the court that it would take a recess "[a]t this time" unless counsel "want[ed] to go until" 11:00 a.m. to mean that the court will delay a recess if counsel wanted to conclude his or her argument by the specified time (because

34

otherwise there is no reason to delay a recess).[14]  At most there may have been a misunderstanding regarding the court's statement.  In any event, the issue is whether the court prejudicially abused its discretion by limiting the duration of rebuttal argument by counsel for the Kims.

Although it may have been better practice to allow counsel additional rebuttal argument for a short period of time after the break, the trial court did not abuse its discretion.  Counsel for the Kims was able argue to the jury the issues he claimed he was unable to discuss in his rebuttal argument.  Counsel for the Kims emphasized the risk-benefit instruction (CACI No. 1204) in his initial closing argument and read the elements to the jury.  He stated that the question on the verdict form whether the Tundra contained a design defect "ties . . . directly" into that instruction.  He argued in rebuttal that Toyota's decision not to make ESC standard equipment was a design choice and that the Tundra was defective because it lacked ESC, a life-saving technology, and he referred to evidence of ESC's effectiveness.  He also argued in rebuttal that Toyota did not make ESC standard equipment because other manufacturers did not do so, and he discussed the sequence of events preceding the accident.  Thus, counsel for the Kims had sufficient time to make his closing arguments, and the trial court's determination that rebuttal argument would end at 11:00 a.m. did not deprive counsel of a full, fair, and reasonable opportunity to argue the case.

---

[14]    As the trial court explained, "It was 10:16 and it was the normal time to take the break – comfort break for the jurors.  You jumped up and you wanted to go forward.  And I asked you at that time, I'll go forward if we end at 11:00. . . .  So instead of taking the break at 10:15, I allowed everybody to hold their . . . water and lasted until 11:00, and at 11 o'clock we were done."

## DISPOSITION

The judgment is affirmed.  Respondents are to recover their costs on appeal.

SEGAL, J.

We concur:

PERLUSS, P. J.

ZELON, J.